

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-22-2003

# Lin v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-4587

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Lin v. Atty Gen USA" (2003). *2003 Decisions.* Paper 38.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/38

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-4587

QIU RONG LIN,

Petitioner

v.

JOHN ASHCROFT, Attorney General
of the United States,

Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(INS No. A 74-323-426)

Argued November 6, 2003
_____

Before: McKEE, SMITH and GREENBERG, *Circuit Judges*

(Filed: December 22, 2003)

*Attorney for Petitioner*
Gang Zhou [Argued]
Suite 1005
277 Broadway
New York, NY 10007

*Attorneys for Respondent*
Joan E. Smiley [Argued]
Richard M. Evans
Linda S. Wernery
William C. Minick

U.S. Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, D.C. 20044

_____

OPINION OF THE COURT

_____

SMITH, *Circuit Judge.*

Petitioner Qui Rong Lin, a native and citizen of China, applied for asylum and

withholding of removal under the Immigration and Nationality Act, and for relief under

the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or

Degrading Treatment or Punishment (hereinafter "Convention Against Torture" or

"CAT"). She claimed that she had been persecuted on the basis of her political opinion

because she had been forced to abort a pregnancy. After a hearing, the Immigration

Judge ("IJ") denied Lin's application and concluded that her application was frivolous

pursuant to 8 U.S.C. § 1158(d)(6). The Board of Immigration Appeals ("BIA")

summarily affirmed. This timely appeal followed.

**I.**

Lin filed an application for asylum and withholding of removal on July 23, 2000.

In response to several questions on the application, Lin attached an unsworn statement

relating, *inter alia*, that her mother had been forcibly sterilized in 1992, and that she also

had been forced to abort a pregnancy. She explained that:

2

In November 1998, my boyfriend . . . and I wanted to get married because I discovered that I was pregnant. At that time, I was seventeen years old and my boyfriend was twenty-one years old. The policy allows only men with age of at least twenty-four years old and women with age of at least twenty-two years old to register for the marriage with the Chinese government. Because we did not reach the legal age for marriage according [to] the family planning policy, we are not permitted to register for our marriage. In January of 1999, the family planning officials discovered that I was pregnant. On January 16, 1999, about one cadre and five family planning officials surrounded my house and I was dragged to Changle City Hospital to perform a forced abortion. On January 17, 1999, I had a forced abortion. My boyfriend and I were so upset that we lost our baby.

In further support of her claim, Lin submitted into evidence, in advance of the hearing, a certificate which purported to show that she had an abortion on January 17, 1999. At a hearing before the IJ on December 29, 2000, Lin confirmed that she had become pregnant at age 17 and was unmarried at the time. Although her initial application did not include details concerning how she learned of her pregnancy or what she did before the abortion, Lin testified that she learned she was pregnant when she sought medical attention in November 1998 at a medical facility which provided treatment for minor ailments such as colds. Lin further testified that she and her boyfriend went into hiding upon learning of the pregnancy and that she had been apprehended by officials and forced to undergo the abortion when she had returned home to retrieve some clothing. The abortion certificate, Lin testified, had been given to her in China. After she arrived in the United States, her mother sent the certificate to her because Lin understood that she would need the certificate to prove that the abortion had been performed.

3

The Office of the American Consulate General in Guangzhou investigated the authenticity of the abortion certificate and reported that the "certificate was fabricated." Earl Turner, the Assistant Officer in Charge, based his report on a letter from Changle City Hospital which advised that the certificate was fabricated because it did not have a doctor's signature and the hospital did not have Lin's abortion operation record.

An April 14, 1998 State Department Profile of Asylum Claims and Country Conditions ("Country Conditions Report") was admitted into evidence at the IJ hearing. It discussed asylum claims based on China's coercive family planning policies and stated that the

> central Government does not authorize physical force to make people submit to abortion or sterilization, but there are reports that this continues to occur in some rural areas as local population authorities strive to meet population targets. Chinese officials acknowledge privately that forced abortions and sterilizations still occur in areas where family planning personnel may be uneducated and ill-trained.

With respect to the Fujian Province, from which Lin emigrated, the report indicated that the U.S. Consulate General in Guangzhou was "not aware of any forced abortions of illegitimate children or children of couples with an early marriage (but could not exclude the possibility)."

The Country Conditions Report further stated that

> The U.S. Embassy and Consulates General are unaware of any so-called 'abortion certificates,' which often are presented as part of asylum applications as evidence of a forced abortion. According to Embassy officials, the only document that might resemble such a certificate and result in confusion is a document issued by hospitals upon a patient's

request after a voluntary abortion. This certificate is used by patients as evidence to request 2 weeks of sick leave after an abortion has been performed, a right provided by the law.

Documentation of this nature, according to the Country Conditions Report, was "subject to widespread fabrication and fraud. . . . The existence of this fraud has been established by direct investigation by U.S. officers in the Consulates General in Guangzhou and Shanghai."

Forced abortions and sterilizations, the Country Conditions Report stated, were prohibited, "but officials acknowledge that there may be instances of force being used." Reportedly, officials who employ this practice are disciplined and undergo retraining, but the report conceded that no data had been supplied to verify that assertion.

At the conclusion of the hearing, the IJ rendered an oral decision, identifying three bases for finding that Lin's testimony was not credible. First, the IJ noted there were inconsistencies between her testimony and her asylum application. The inconsistencies, according to the IJ, were Lin's failure to refer to certain details in her asylum application, specifically her treatment in November 1998 at the facility where she learned she was pregnant and the fact that she was in hiding with her boyfriend until she returned home in January to obtain some clothes.

As a second basis for finding that Lin was not credible, the IJ listed certain "inconsistencies" between Lin's story and the Country Conditions Report. In particular, the IJ observed that the report indicated that abortion certificates were provided only for

voluntary procedures, not forced abortions as Lin alleged. The IJ also pointed out that, according to the Country Conditions Report, there were significant financial disincentives for having illegitimate children and there was nothing in the report to suggest that there was "any general policy to abort illegitimate children." Finally, the IJ considered the Consulate's investigative report which concluded that Lin's abortion certificate was fabricated.

After discussing these "inconsistencies" and the Consulate's investigation, the IJ concluded that the abortion certificate was fraudulent. He also found that Lin had "deliberately lied" and denied her applications for asylum and withholding, as well as her request for relief under the CAT. In addition, the IJ declared that Lin's asylum application was frivolous under 8 U.S.C. §1158(d)(6).

Lin appealed to the BIA. During the pendency of that appeal, she married Zi Jian Lu, an alien who had been granted the status of permanent resident. In February 2001, Lin filed an I-130 petition with Immigration and Naturalization Service. In November 2001, she gave birth to a baby girl, Anna Lu. On April 19, 2002, Zi Jian Lu was naturalized and became a citizen of the United States. Lin's I-130 petition was approved and she then filed an application with the Immigration and Naturalization Service for an adjustment of her status under 8 U.S.C. § 1255(i).[1]

---

[1]The adjustment of status under § 1255(i) enables a previously ineligible alien to maintain lawful status. Fragomen, Austin, T., Jr., Steven C. Bell & Thomas E. Moseley, *Immigration Legislation Handbook*, § 3.2 (2000, Database updated April 2003).

The BIA summarily affirmed the IJ's decision on December 3, 2002. Lin filed a timely petition for review, challenging both the IJ's denial of her application and his determination that she filed a frivolous asylum application.

**II.**

The IJ had jurisdiction pursuant to 8 C.F.R. § 208.2(b). The BIA had appellate jurisdiction pursuant to 8 C.F.R. § 3.1(b). We exercise appellate jurisdiction over the BIA's order pursuant to § 242(b) of the Immigration and Nationality Act. 8 U.S.C. § 1252(b); *see also Abdulai v. Ashcroft*, 239 F.3d 542, 548-49 (3d Cir. 2001). When the BIA defers to the IJ, however, "we must review the decision of the IJ." *Gao v. INS*, 299 F.3d 266, 271 (3d Cir. 2002); *Abdulai*, 239 F.3d at 549 n.2. We limit our review to determining whether the IJ's findings are supported by substantial evidence. *Gao*, 299 F.3d at 272. "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir. 1998). We may reverse only where the evidence compels a conclusion contrary to that of the IJ. 8 U.S.C. § 1252(b)(4)(B) ("the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

The substantial evidence standard also applies to adverse credibility determinations. *Gao*, 299 F.3d at 272. Accordingly, an adverse credibility finding should not be disturbed "unless 'any reasonable adjudicator would be compelled to conclude to

the contrary.'" *Id.* (quoting *Senathirajah v. INS*, 157 F.3d at 216). Specific reasons should be given for finding a witness not credible and those "reasons must bear a legitimate nexus to the finding." *Balasubramanrim v. INS*, 143 F.3d 157, 162 (3d Cir. 1998).

"The federal asylum statute confers discretion on the Attorney General to grant asylum to an alien applicant 'if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A).'" *Abdille v. Ashcroft*, 242 F.3d 477, 482 (3d Cir. 2001) (quoting 8 U.S.C. § 1158(b)(1)). Section 1101(a)(42)(A) defines "refugee," in relevant part, as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). This definition further specifies that persecution on the basis of political opinion includes any person who has been "forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program" or who has a "well-founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal or resistance . . . ." *Id.* The burden is upon the applicant to establish that she "qualifies as a refugee under the statute." *Obianuju Ezeagwuna v. Ashcroft*, 301 F.3d 116, 126-27 (3d Cir. 2002).

8

A request for asylum is separate and distinct from an application for withholding of removal. Because the standard for obtaining a grant of withholding is more demanding than the standard for asylum, "[i]t follows . . . that an applicant who fails to prove 'well-founded fear' in his quest for asylum will similarly be unable to prove 'clear probability' with respect to withholding of deportation." *Janusiak v. INS*, 947 F.2d 46, 47 (3d Cir. 1991); *see also Lukwago v. Ashcroft*, 329 F.3d 157, 182 (3d Cir. 2003).

Withholding under the Immigration and Nationality Act is different from withholding under the Convention Against Torture. *Lukwago*, 329 F.3d at 182. The CAT requires that the alien show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The torture, however, need not be inflicted "on account of any protected ground." *Lukwago*, 329 F.3d at 183 (citing 8 C.F.R. § 208.18(a)(1)).

## III.

Lin submits that the IJ's decision denying her asylum claims was not supported by substantial evidence because it relied to a large degree on the Consulate's investigation. The results of the Consulate's investigation and the supporting documentation should not have been introduced, in Lin's view, because they were unreliable and they violated her due process rights. As support, she cites our recent decision in *Ezeagwuna v. Ashcroft*, 325 F.3d 396 (3d Cir. 2003).

In *Ezeagwuna,* we concluded that the admission of the results of an investigation

9

by the State Department regarding the authenticity of certain documents offered by the petitioner violated her due process rights because the letter from the State Department did not satisfy the standards of reliability and trustworthiness. 325 F.3d at 408. We were troubled by the following: (1) the INS provided the alien with the State Department letter calling her documents into question only several days before the hearing; (2) the letter, which contained multiple hearsay, did not provide information from anyone with direct knowledge of the investigation; (3) there was too much reliance by the INS on the prestige of the State Department's letterhead and seal; and, (4) the letter failed to provide any information regarding how the investigation was conducted. We declared that the "nature of the purported 'investigation' is a matter of pure conjecture and it can provide no basis for a finding of falsification on the part of Ms. Obianuju." 325 F.3d at 408.

Some of the evidentiary problems we identified in *Ezeagwuna* are also present in the investigation of Lin's abortion certificate. First, the Consulate's investigative report contains multiple hearsay, none of which provides any first-hand knowledge of the investigation. The initial investigation was conducted by an unnamed person and transmitted to a Dr. Qie. Dr. Qie then noted his conclusions in a letter to INS investigator Susanna Liu from the neighboring province of Guangzhou. Liu then transmitted an "unofficial translation" of Dr. Qie's report to Mr. Turner, the Assistant Officer in Charge in Guangzhou. Turner advised Susan Roy, in the Newark office of INS, of the results of the investigation. Roy's letter was considered by the IJ. Because Liu is from Guangzhou

10

Province, it is unlikely that she interacted personally with Dr. Qie in the Fujian Province and nothing in the record suggests such direct contact. Accordingly, the IJ would have had no basis to conclude that Liu had an opportunity to assess Dr. Qie's credibility.

In addition to the multiple hearsay problems, the report and its supporting documentation are devoid of any description of how the investigation was conducted. There was nothing before the IJ to suggest who actually searched the hospital records, when the records were checked, what hospital records were reviewed and whether there were any identifying criteria -- other than Lin's name -- used in searching the records. Without more information, a factfinder could only speculate about the reliability of the Consulate's investigation.[2] For these reasons, we conclude that the Consulate's report cannot be considered as substantial evidence for the IJ's decision.

The IJ's decision is also unsupported by what he characterized as "inconsistencies" between Lin's asylum application and her testimony. These "inconsistencies" were nothing more than omissions of detail, supplying background information for the heart of her claim that she was forced to undergo an abortion. The absence of these details in her asylum application neither alters the nature of Lin's claim that she was subjected to a forced abortion nor embellishes it to such a degree that it may be considered inconsistent with her testimony before the IJ. As a consequence, the omission of these details from

---

[2]We note that the Consulate's investigation was not authenticated as required by 8 C.F.R. § 287.6. Authentication, however, would not have remedied the deficiencies we describe.

11

her asylum application cannot constitute substantial evidence for the IJ's adverse credibility determination. *Gao*, 299 F.3d at 272 (recognizing that inconsistencies bearing on the heart of an alien's asylum claim may be substantial evidence, but minor inconsistencies that do not relate thereto are not an adequate basis for an adverse credibility finding).

Despite the foregoing deficiencies in the IJ's credibility analysis, the IJ had an appropriate basis to reject Lin's testimony because it was at odds in some respects with the Country Conditions Report. Although the Consulate's investigation by itself may not have afforded a sufficient basis to conclude that Lin's abortion certificate was fabricated, the Country Conditions Report did cast doubt on whether the certificate was genuine. The Country Conditions Report indicated that certificates were provided for those undergoing voluntary abortions, thereby undermining Lin's claim that she received her certificate when she was forced to abort her pregnancy. In addition, the Country Conditions Report confirmed that documents regarding birth control measures were often fabricated in the Fuzhou area, the area named by Lin in her asylum application as her native region. As we noted in *Kayembe v. Ashcroft*, 334 F.3d 231, 235-36 (3d Cir. 2003), a Country Conditions Report may constitute substantial evidence to support an agency's determination. Thus, we conclude that there was substantial evidence to support the IJ's adverse credibility determination and his denial of Lin's claims for asylum, withholding of removal and relief under the CAT.

Our conclusion that there was substantial evidence to support the IJ's adverse credibility determination does not, however, resolve the issue of whether the IJ erred in finding that Lin's asylum application was frivolous under § 1158(d)(6).[3]

Section 1158(d)(6), which was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), provides:

> If the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter, effective as of the date of a final determination on such application.

8 U.S.C. § 1158(d)(6); Publ. L. 104-208, Div. C, Title VI, § 604 (September 30, 1996). As the *Immigration Legislation Handbook* explains, this is "one of the most extreme provisions in the IIRIRA. The provision permanently bars an alien from receiving any nonimmigrant or immigrant benefits once it is triggered. Moreover, the bar may not be waived under any circumstances." Fragomen, Austin, T., Jr., Steven C. Bell & Thomas E. Moseley, *Immigration Legislation Handbook*, § 7:95 (2000, Database updated April 2003). "The bar covers any benefit under the INA, including immigrant or nonimmigrant entry. . . ." *Id.* § 7:105. Thus, this exclusion precludes an alien from ever obtaining relief under the Act by means of a subsequent application or even an adjustment of status of the

---

[3]We note that the government's brief completely failed to address Lin's argument that the IJ erred in finding that her application was frivolous.

13

type Lin is seeking under § 1255.

Although "frivolous" is not defined by the IIRIRA, implementing regulation 208.20 sets forth certain criteria which must be found before an asylum application may be determined to be frivolous. It provides, in relevant part, that:

> an applicant is subject to the provisions of section 208(d)(6) of the Act only if a final order by an immigration judge or the Board of Immigration Appeals specifically finds that the alien knowingly filed a frivolous asylum application. For purposes of this section, an asylum application is frivolous if any of its material elements is deliberately fabricated. Such finding shall only be made if the immigration judge or the Board is satisfied that the applicant, during the course of the proceedings, has had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

8 C.F.R. § 208.20 (2000) (hereinafter cited as "Reg. § 208.20").

The "knowingly" requirement contained in both the statute and the regulation, connotes that a frivolous finding may not be made simply on the basis of an adverse credibility determination. 8 C.F.R. § 1158(d)(6); Reg. § 208.20. Frivolousness requires more. Such a finding may be made only when: (1) some material aspect of the alien's claim is false or has been falsified; (2) the alien knew, at the time of filing, that this material aspect of her claim was untrue; and (3) the alien, after a sufficient opportunity to do so, failed to satisfy the IJ that any discrepancies or implausibilities were not the result of deliberate fabrication. Reg. § 208.20. In other words, the factfinder may not consider

14

an adverse credibility determination as coextensive with a finding of frivolousness.[4]
Although he may look to the same evidentiary record as a basis for both adverse
credibility and frivolousness determinations, the IJ must make separate and distinct
rulings.

With respect to the second prong of this test, we emphasize that the alien must
know of the falsehood at the time she filed her application. This requirement, in our
view, is consistent with the statutory language which specifies that the "alien has
knowingly made a *frivolous application for asylum . . . .*" 8 U.S.C. § 1158(d)(6).
Regulation 208.20 maintains this same requirement, providing that § 1158(d)(6)'s
permanent bar applies if there is a finding that the "alien knowingly *filed a frivolous
asylum application."* In our view, if a factfinder has determined that an alien knew at the
time she filed an application that some material aspect of her claim was untrue, then the

_____

[4]In enumerating the elements on which a finding of frivolousness must be predicated,
we rely principally upon the language of § 1158(d)(6) and Reg. § 208.20. The limited
caselaw on this issue has focused on whether a petitioner was afforded sufficient
opportunity to explain the discrepancies and implausible aspects of his or her claim. *See
Farah v. Ashcroft*, __ F.3d __, 2003 WL 22682434 (9th Cir. Nov. 14, 2003) (reversing
determination that the petitioner's application was frivolous because the petitioner had
not been given sufficient opportunity to explain the discrepancies in the record); *Efe v.
Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002) (affirming finding of frivolousness because
the alien had failed "to take advantage of the ample opportunity to clarify his
contradictory testimony"); *Barreto-Claro v. U.S. Attorney General*, 275 F.3d 1334, 1338-
39 (11th Cir. 2001) (affirming finding by the BIA that the petitioner's asylum application
was frivolous inasmuch as the petitioner had conceded during his testimony before the IJ
that he had knowingly made material fabrications in answering several questions on his
first asylum application).

applicability of § 1158(d)(6)'s permanent bar is neither excessive nor extreme. It is an appropriate sanction for undertaking to manipulate the immigration system from the start, conduct which is fundamentally different from offering testimony or exhibits, once the process is underway, which are not credited by the factfinder.

With this background, we consider Lin's challenge to the IJ's finding of frivolousness.[5] Inasmuch as the implementing regulation requires that a frivolous application is one in which "any of its material elements is deliberately fabricated," we review this factual determination employing the familiar substantial evidence standard. *See* 8 U.S.C. § 1252(b)(4). Whether the factual findings by the IJ are legally sufficient for a conclusion of frivolousness, however, is a question of law subject to plenary review. *Barreto-Claro*, 275 F.3d at 1338.

Here, the first prong of our test requires that some material aspect of Lin's claim was false or falsified. The IJ's finding of frivolousness was based predominantly upon his determination, consistent with the Consulate's investigation, that the abortion certificate had been fabricated. The Consulate's investigation, as we have explained above, was unreliable. It cannot, therefore, support the IJ's finding of frivolousness.

---

[5]Lin's counsel conceded at oral argument that the notice requirement of § 1158(d)(4) was met. Thus, we do not consider whether the government's boilerplate notice in the asylum application was sufficient to comply with the statutory requirement of § 1158(d)(4). *Compare Barreto-Claro*, 275 F.3d at 1337 n.5, 1339 n.10 (noting that petitioner received two notices warning him about the permanent bar resulting from a finding that an application was frivolous, as well as an oral warning from the IJ describing the consequences of a frivolous application).

16

Without the benefit of the Consulate's report, the Government's only evidence tending to show that the abortion certificate was fabricated is the Country Conditions Report. That report, however, cuts both ways. Certain aspects, as we observed in concluding that there was substantial evidence to support the IJ's denial of Lin's claim, cast some doubt on the genuineness of the certificate and Lin's credibility. Other statements in the Country Conditions Report, however, are consistent with Lin's testimony. In discussing China's coercive family planning policy, the report acknowledged that some forced abortions continued to occur in rural areas. The report described the Changle area, which would include the hospital where Lin claims to have been subjected to a forced abortion, as a rural area. Thus, the Country Conditions Report accounts for an aspect of Lin's testimony found by the IJ to have lacked credence, and that report cannot establish, without more, that the abortion certificate was fabricated. We conclude that the IJ erred in his application of § 1158(d)(6) and we reverse that determination.[6]

In sum, the IJ's denial of Lin's application for asylum, withholding of removal and relief under the CAT was appropriate and we will affirm that portion of the IJ's decision. We reverse, however, with respect to the IJ's determination that Lin's application was frivolous. Accordingly, we grant Lin's petition for review.

---

[6]Because we conclude that substantial evidence is lacking for the IJ's determination that the abortion certificate was fabricated, we need not consider whether Lin was afforded, "during the course of the proceedings," a sufficient opportunity to explain the discrepancies or implausible aspects of her claim as required by Reg. § 208.20.

_____

TO THE CLERK:

Please file the foregoing Opinion.

By the Court,

 /s/ D. Brooks Smith
Circuit Judge