**Zhen Nan LIN, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Respondent.**

**Docket No. 04–0917–AG.**

United States Court of Appeals, Second Circuit.

Argued: March 22, 2006.

Decided: Aug. 3, 2006.

Theodore Cox, (David X. Feng, on the brief), New York, NY, for Petitioner.

Amy S. Howe, Assistant United States Attorney (Thomas, E. Moss, United States Attorney for the District of Idaho, on the brief), Boise, ID, for Respondent.

Before STRAUB and SACK, Circuit Judges, and TRAGER, District Judge.*

STRAUB, Circuit Judge.

Petitioner Zhen Nan Lin ("Lin") (Case No. A75 559 667), a citizen and native of the People's Republic of China, petitions this court for review of the January 28, 2004, decision of the Board of Immigration Appeals (BIA) reversing Immigration Judge (IJ) Annette S. Elstein's grant of asylum and withholding of removal. *In re Zhen Nan Lin,* No. A75 559 667 (B.I.A. Jan 28. 2004), *rev'g* No. A75 559 667 (Immig. Ct. N.Y. City May 1, 2002). Lin entered the United States without inspection along the Canadian border in August 1997, and on November 28, 1997, applied for asylum based on his political persecution by the Chinese government. The IJ found that Lin's story of imprisonment and political persecution was credible and that he qualified for asylum and withholding of

removal. The IJ dismissed as unreliable a report from the United States Consulate in Guangzhou (the "Consular Report"), stating that the certificate of release from prison (the "Certificate of Release") that Lin submitted in support of his asylum application was a forgery. Further, the IJ held that the State Department and the Immigration and Naturalization Service (INS)[1] had violated Lin's right to confidentiality by sending a copy of the Certificate of Release to the Prison Administration Bureau of Guangdong[2] Province (the "Prison Bureau").

The INS appealed, and the BIA reversed the IJ's decision. Relying on the Consular Report, the BIA concluded that the Certificate of Release was a forgery, and, therefore, that Lin's testimony was not credible. The BIA also held that the government had not violated Lin's confidentiality. Lin argues on appeal that the BIA's adverse credibility finding is not supported by substantial evidence and that the government's disclosure has made it more likely that he will be persecuted upon his return to China. We agree that the government violated the confidentiality guarantee of 8 C.F.R. § 208.6. We further

---

\* The Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

1. The Homeland Security Act of 2002, transferred the functions of the "INS" to the Department of Homeland Security (DHS) and retained in the Department of Justice (DOJ) the functions of the Executive Office for Immigration Review (EOIR). *See* Pub.L. 107–296, tit. IV, subtits. D, E, F, 116 Stat. 2135, 2192 (Nov. 25, 2002). In 2003, the Immigration and Customs Enforcement division of the Department of Homeland Security replaced the INS as this country's immigration enforcement agency. *See Borovikova v. U.S. Dep't of Justice,* 435 F.3d 151, 157 n. 8 (2d Cir.2006). For ease of reference, this opinion will refer the government immigration officials as the INS.

These changes also required the reorganization of the title 8 of the Code of Federal Regulations to place the INS regulations and the EOIR regulations into separate chapters. *See* 68 Fed.Reg. 9824 (Feb. 28, 2003). Chapter I of title 8 of the Code of Federal Regulations applies to the INS and DHS, and Chapter V applies to the EOIR and DOJ. Provisions applying to both the INS and EOIR were duplicated in chapter V. *See* 68 Fed.Reg. at 9825. Therefore, the section at issue in this case, 8 C.F.R. § 208, was duplicated at 8 C.F.R. § 1208.6. Since the events in this case occurred prior to the reorganization of title 8, we will refer only to section 208.6.

2. Guangdong is a province in China, and Guangzhou is its capital city.

conclude that the BIA's adverse credibility finding was not supported by substantial evidence as it was based on the unreliable Consular Report. Accordingly, the petition for review is granted.

## BACKGROUND

### I. Factual Background

Lin testified as follows. He was born and raised in Guangzhou, China. He graduated from Chai Nan University, a school with approximately eight-thousand students. In 1989, while attending Chai Nan, Lin became involved in the pro-democracy movement and became the leader of the movement's student group. During that year, he led four student protests in support of the pro-democracy movement in Beijing.

After the Chinese government's massacre of students and other protestors in Tiananmen Square on June 4, 1989, Lin and his student group began to print leaflets with slogan's like "the blood of the students" lost in Beijing is not in vain. We have to seek justice for them or "Li Peng [the Chinese Premier at the time of the Tiananmen Square massacre] is the culprit." Lin would hide the leaflets in his sleeves and secretly hand them out to people on the street. On June 24, 1989, Lin handed out anti-government leaflets to two undercover public security officers, who immediately arrested him. The officers took him to a police station where they interrogated and beat him to extract a confession and information about his fellow activists. Lin was detained at the police station for approximately five weeks. During that time, he suffered four beatings by the public security officers, which caused him severe pain.

On August 30, 1989, Lin was brought before a judge on charges of supporting the Tiananmen Square protests, attempting to overthrow the government, and handing out counter-revolutionary leaflets. He was convicted and sentenced to five-years' imprisonment with forced labor and reeducation. He served his sentence in prison number seven located in Nanmun, a suburb of Guangzhou city. Six months after arriving at the prison, Lin began attending mandatory reeducation class approximately twice a week. He was released from prison on September 3, 1994. The prison issued Lin a Certificate of Release as proof that he had completed his sentence.

After his release, Lin lived with his parents and worked as an accountant in a construction company. Because of his criminal record, he was shunned by his co-workers and questioned and harassed by his superiors. For a year and a half, Lin focused on working hard and did not become involved in politics.

In October 1996, Lin learned that Wang Dan, a prominent pro-democracy leader, had been arrested.[3] Lin prepared a petition demanding Wang Dan's release. After circulating the petition, he sent one copy to the Beijing Municipal Government, and he and two of his former classmates brought another copy to the Guangzhou Municipal Government building. While waiting to be admitted to see the Guangzhou officials, Lin and his classmates made speeches outside the government building to a crowd of approximately 100 people. After a few hours, Lin was admitted to see a local official, who stated that he would forward Lin's petition to Beijing.

Later that night, Lin awoke to the sound of people yelling and banging on the door of his house. He saw from a window a

---

3. The State Department's report on Chinese asylum claims confirms that Wang Dan was arrested in 1995 and sentenced in 1996 to 11 years in prison.

group of people dressed in plain clothes standing outside his door. Lin believed that these people were public security officers coming to arrest him for circulating the petition and making anti-government speeches. Lin hid and did not answer the door. After the people left, he fled to his uncle's house, and the following day, he traveled to his cousin's house where he remained for one month. Soon after Lin arrived at his cousin's house, public security officials searched his uncle's house looking for him. He then moved to his girlfriend's uncle's house where he stayed for a period of three months until his family and friends raised enough money for him to leave China. Lin arrived in the United States on August 29, 1997, and filed an application for asylum and withholding of removal on November 28, 1997.

## II. Procedural History

On January 20, 1998, the INS served Lin with a notice to appear, charging him with removability under section 212(a)(6)(A)(I) of the Immigration and Naturalization Act (INA). At a hearing before the IJ on February 17, 1998, Lin admitted the allegations in the notice to appear and conceded removability. On July 15, 1998, Lin appeared for his individual hearing, testified to the facts detailed above, and submitted documents in support of his application. The IJ granted Lin a continuance to authenticate the documents, including the Certificate of Release, and for the government to send the documents for a forensic evaluation. The authentication of the documents, however, took longer than expected, and Lin's hearing was continued five more times. During this period, Lin switched attorneys. Both of Lin's attorneys told the IJ that

they were attempting to authenticate the Certificate of Release.

On October 12, 2000, the government submitted the Consular Report to the IJ and maintained that it proved the Certificate of Release was a forgery. The Consular Report consists primarily of two documents.[4] The first document, dated June 1, 2000, is a fax from the Prison Bureau, to Martin Steiner, a member of the Anti–Fraud Unit of the U.S. Consulate General in Guangzhou (the "Steiner Letter"). The following is a translation of the entire text of the Steiner Letter: "We have received your inquiry for verification of the authenticity of LIN, Zhen Nan's Certificate of Release. Through investigation, LIN, Zhen Nan's Certificate of Release (Guang Qi Jian Releasing No. 94–339) is counterfeit and invalid." The second document is a Report of Investigation from Susanna Liu, an investigator with the INS office in Guangzhou (the "Liu Report"). The entire text of the Liu Report is the following:

Predication of investigation:

The investigation was predicated on receipt of a letter from [Assistant District Counsel] Meagen R. Sleeper requesting verification of documents submitted to support a claim for benefits. The documents included a Certificate of Release issued by Guangzhou No. 7 Prison on September 3, 1994.

Results:

A call from Prison Affairs Section of Prison Administration Bureau of Guangdong Province certifies that the Certificate of Release was fabricated. There is no No. 7 Prison in Guangzhou at all.

The government concedes that it provided the Prison Administration Bureau with an

---

**4.** The Consular Report also contains cover letters that provide no additional substantive information.

unredacted copy of the Certificate of Release.

Based on these two documents (to which we will refer collectively as the "Consular Report"), the government argued that under *In re O–D–*, 21 I. & N. Dec. 1079, 1083 (BIA 1998), Lin's application should be denied because he submitted a forged document. In her written decision of May 1, 2002, the IJ rejected this argument and held that Lin was entitled to asylum and withholding of removal. The IJ found that Lin testified credibly about his arrests, imprisonment, and beatings and that they occurred because of his political activity. The IJ held that "the method used by the [INS's] investigator at the U.S. Consulate in Guangzhou to authenticate the Certificate gives this Court cause to question the validity of the report's conclusion." The IJ concluded that the INS's submission of the Consular Report to the Prison Bureau put the Chinese authorities "on notice that a Chinese national previously convicted of a political offense was seeking immigration benefits in the U.S. based on a claim of persecution." The IJ took administrative notice of the fact that China has consistently denied abusing its citizens' human rights, and that, therefore, "it would not be unreasonable to conclude that the Chinese government's response [to the U.S. requests for information] could have been intended to frustrate the respondent's asylum claim by denying [the] authenticity of his documents." The IJ, therefore, concluded that the Consular Report was untrustworthy and insufficient to prove that the Certificate of Release was fraudulent. The IJ held that Lin's testimony was credible, that Lin had been the victim of past persecution, and that the government had not rebutted the presumption that Lin had a well-founded fear of future persecution based on his prior persecution.

In the alternative, the IJ found that Lin had a well-founded fear of future persecution based on not only his fear that he would be arrested for his past anti-government activities but also his fear that he would be persecuted for seeking political asylum in the United States. Reiterating her earlier finding, the IJ held that "[i]t is not unreasonable to assume that such repeated inquiries by U.S. immigration officials regarding a convicted anti-government activist would put the Chinese government on notice that the respondent was seeking asylum in the U.S." Therefore, the IJ held the government violated 8 C.F.R. § 208.6 and that Lin had a well-founded fear that he would be targeted for persecution because of the government's disclosure of the Certificate of Release to the Prison Bureau.

The government appealed the IJ's decision. The BIA reversed, holding that the government had not violated 8 C.F.R. § 208.6 by submitting the Certificate of Release to the Prison Bureau. Specifically, the BIA held that "[a]lthough a copy of the certificate of release was forwarded to Chinese officials for authentication, the record does not reveal that any sensitive information from [Lin's] asylum application was disclosed to anyone other than United States government officials." Furthermore, the BIA held that the IJ had improperly disregarded the Consular Report, which, in the BIA's opinion, established that Lin had submitted a fraudulent document. Based on the fact that Lin submitted a fraudulent document and his failure to offer evidence rebutting the Consular Report, the BIA found that Lin was not credible. It, therefore, denied Lin asylum and ordered him removed to China.

On February 23, 2004, Lin filed a timely petition for review of the BIA's decision. 28 U.S.C. § 1296(b).

## DISCUSSION

### I. Lin's Asylum Claim

#### A. Standard of Review

 We review *de novo* the BIA's determination of mixed questions of law and fact, as well as the IJ's application of law to facts. *Poradisova v. Gonzales,* 420 F.3d 70, 77 (2d Cir.2005). Where, as here, the BIA interpreted a regulation promulgated by the Attorney General under the INA, we afford "substantial deference" to the BIA's interpretation, *see Joaquin–Porras v. Gonzales* 435 F.3d 172, 178 (2d Cir.2006) (internal quotation marks omitted), unless it is plainly erroneous or inconsistent with the regulation, *Restrepo v. McElroy,* 369 F.3d 627, 639 n. 19 (2d Cir. 2004), or inconsistent with the agency's previous interpretation, *see Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 356, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000); *cf. Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (stating that "the consistency of any agency's position is a factor in assessing the weight that position is due").

#### B. Lin's Right to Confidentiality under 8 C.F.R. § 208.6

 Reversing the IJ, the BIA held that the government had not violated the confidentiality provisions of 8 C.F.R. § 208.6 by submitting the Certificate of Release to the Prison Bureau for authentication. According to the BIA, "the record does not reveal that sensitive information was disclosed to anyone other than United States government officials." We hold the BIA misinterpreted the scope of section 208.6 and that the government breached the confidentiality owed to Lin as an asylum applicant.

Section 208.6 provides, in pertinent part: "Information contained in or pertaining to any asylum application ... shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General." 8 C.F.R. § 208.6. The government does not argue that any of the explicit exceptions contained in section 208.6 apply, but instead offers three arguments for why Lin's confidentiality was not breached: (1) no "sensitive" information was disclosed to the Chinese officials; (2) as a matter of policy, the government must be able to authenticate documents by disclosing them to a foreign government; and (3) Lin waived any objection to the government's disclosure. We find none of these *post hoc* rationales persuasive.

 First, the government asks us to affirm the BIA's gloss on section 208.6 as only protecting against the disclosure of "sensitive" information. We begin our analysis of 208.6 with the plain meaning of the language used. *See Forest Watch v. U.S. Forest Serv.,* 410 F.3d 115, 117 (2d Cir.2005) ("The plain meaning of language in a regulation governs unless that meaning would lead to absurd results." (internal quotation and alteration marks omitted)). The regulation is unambiguously absolute: on its face, section 208.6 explicitly protects "[i]nformation" that is "contained in" or "pertaining to" any asylum application. § 208.6(a). The plain language of the regulation does not include any qualifiers like the word "sensitive," and we decline to read such a limitation into the regulation's text. Where, as here, the BIA's interpretation of a regulation is inconsistent with the plain language of the regulation, we owe no deference to its interpretation. *See Restrepo,* 369 F.3d at 639 n. 19. So long as the information is "contained in" or "pertain[s] to" any asylum application it is confidential and may not be disclosed by government officials.

Even if the phrases "contained in" and "pertaining to" were ambiguous, the

BIA's interpretation that only "sensitive" information is protected would still be unworthy of deference because it is plainly inconsistent with prior, more comprehensive and authoritative statements by the INS, the Justice Department, and the State Department. INS has published a guide for federal government employees on protecting the confidentiality of asylum applicants. *See* U.S. Citizenship and Immigration Services, *Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (June 3, 2005) ("Fact Sheet"), *available at* http://www.uscis.gov/graphics/lawsregs/handbook/FctSheetConf_Attch.pdf (last visited July 25, 2006). The INS considers the Fact Sheet to be "comprehensive" and to "clarif[y]" the regulations. Letter from Joseph E. Langlois, the Director of the Asylum Division, Office of Refugee Asylum and International Operations, U.S. Citizenship and Immigration Services, to all Asylum Office Directors and Deputy Directors (June 15, 2005), *available at* http://www.uscis.gov/graphics/lawsregs/handbook/FctSheetConf061505.pdf (last visited July 25, 2006).

■ The Fact Sheet does not distinguish between the disclosure of sensitive and non-sensitive information contained in or pertaining to an asylum application. Instead, it focuses on preventing the disclosure of facts that would link an alien's identity with the fact that the alien has applied for asylum in the United States. The Fact Sheet provides that, absent one of the specified exceptions:

> [C]onfidentiality [under 8 C.F.R. § 208.6] is breached when information contained in or pertaining to an asylum application is disclosed to a third party in violation of the regulations, and the unauthorized disclosure is of a nature that allows the third party to link the identity of the applicant to: (1) the fact

that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) *facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum.*

Fact Sheet at 3. Whether information is "sensitive" is therefore irrelevant if it enables a third party to infer that the subject of the information has applied for asylum in the United States.

The Fact Sheet's interpretation of section 208.6's scope has been the consistent government interpretation of the scope of section 208.6 and was first discussed in a 2001 Department of Justice memorandum intended to provide guidance to government personnel on maintaining confidentiality of asylum applicants while verifying their claims. *See* Memorandum from Bo Cooper, INS General Counsel, to Jeffrey Weiss, INS Director of Int'l Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information* 3 (June 21, 2001) ("Cooper Memo"), *available at,* http://judiciary.house.gov/legacy/82238.PDF (last visited July 25, 2006). This interpretation of section 208.6 is also contained in the United States Citizen and Immigration Service manual on affirmative asylum procedures. *See* U.S. Citizenship & Immigration Services, Office of International Affairs: Asylum Division, *Affirmative Asylum Procedures Manual* 59 (rev.Feb.2003), *available at* http://uscis.gov/graphics/lawsregs/handbook/AffrmAsyManFNL.pdf (last visited July 25, 2006) ("Asylum Manual") (quoting the standard from the Cooper Memo as the general standard for confidentiality).

The Fact Sheet's interpretation of the scope of section 208.6 is similar to the approach taken by the Supreme Court in *United States Department of State v. Ray,*

in which applicants for political asylum from Haiti sought disclosure of the identity of Haitian refugees who had been repatriated by the United States. 502 U.S. 164, 168, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). The applicants requested copies of the State Department's reports of interviews with undocumented Haitian nationals who had been returned to Haiti. *Id.* The State Department provided copies of these reports, but redacted the names and other information identifying the repatriated refugees. *Id.* at 169, 112 S.Ct. 541. The Eleventh Circuit "disagreed with the District Court's *'de minimis'* characterization of the privacy interest at stake," and instead concluded that the "significant privacy interests [of the refugees] .... were outweighed by the public interest in learning whether the Government is 'adequately monitoring Haiti's compliance with its obligation not to persecute returnees' and 'is honest to the public' when its officials express the opinion that Haiti is adhering to that obligation." *Id.* at 170, 112 S.Ct. 541 (quoting *Ray v. United States Dep't of Justice,* 908 F.2d 1549 (11th Cir.1990)). The Supreme Court reversed. The Court found that so long as the identities of the refugees remained unknown, that the disclosure of the "highly personal information" in the reports to be "only a *de minimis* invasion of privacy." *Id.* at 175–76, 112 S.Ct. 541. However, when "the personal information is linked to particular interviewees," the Court described the invasion of privacy as "significant." *Id.* at 176, 112 S.Ct. 541. The Court further found that disclosure of the unredacted summaries could subject the refugees to retaliatory action by the Haitian government and others based on their aborted attempts to emigrate and their cooperation with the United States government. *Id.* at 176, 112 S.Ct. 541; *accord* Fact Sheet at 2 ("Public disclosure of asylum-related information may subject the claimant to retalia-

tory measures by government authorities or non-state actors in the event that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.").

We find that the BIA's interpretation that a breach of section 208.6 occurs only when "sensitive information" is disclosed to be inconsistent with the government's prior interpretations of the regulation found in the Fact Sheet, the Asylum Manual, and the Cooper Memo. Because we have "reason to suspect that the interpretation does not reflect the [BIA's] fair and considered judgment on the matter in question," *see Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), the "substantial deference" that we normally accord the BIA's interpretation of its own regulations, is not appropriate in this case, *see Norfolk S. Ry. Co.,* 529 U.S. at 356, 120 S.Ct. 1467 (declining to defer to the agency's construction of its own statute where, *inter alia,* its position contradicted the agency's previous constructions of the regulation); *cf. INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (stating that the "inconsistency of the positions the BIA has taken through the years" militated against deferring to its current interpretation of a provision of the INA); *Drake v. Fed. Aviation Admin.,* 291 F.3d 59, 67 (D.C.Cir. 2002) (deferring to the agency's interpretation because position was "not inconsistent with the agency's prior statements and actions regarding the disputed regulation"), *cert. denied,* 537 U.S. 1193, 123 S.Ct. 1295, 154 L.Ed.2d 1028 (2003). Accordingly, the relevant issue is whether the information disclosed by the government was sufficient to give rise to a reasonable inference that Lin had applied for asylum.

■ Without question, the Certificate of Release provides sufficient information to support the inference that Lin was in the United States and applying for asylum. First, the Certificate of Release contains Lin's full name, sex, age, prisoner number, former residency in China, all of which are sufficient to identify Lin to the Chinese officials. Second, the Certificate of Release states that Lin was imprisoned for "conspiracy of anti-revolution," identifies Lin as politically opposing the Communist government. *See* U.S. Dep't of State, Country Reports on Human Rights Practices: China 2005 (March 8, 2006) ("2005 Country Report") (reporting that many political prisoners convicted for counterrevolution continue to be imprisoned), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61606.htm (last visited July 25, 2006). Third, that U.S. immigration officials were holding the Certificate of Release gives rise to an inference that Lin is in the United States or has been in contact with the U.S. government. *See* Cooper Memo at 4 ("[T]he possession and investigation of certain personal documents by the U.S. government might be sufficient to give rise to a reasonable inference that the applicant submitted the document to the U S government to buttress an asylum claim.").

Certain documents "such as a PRC hospital record pertaining to coercive family planning measures" that are "commonly known to form the basis of asylum claims in the United States" may give rise to an especially strong inference that the identified alien is applying for asylum. *Id.* A certificate of release from a Chinese prison for "conspiracy of anti-revolution" presented by U.S. State Department and immigration officials is, like the abortion certificate, a document that gives rise to a strong inference that the prisoner is seeking asylum. It was well known (then as it is now) that many Chinese nationals emigrate to the United States every year. *See, e.g.,*

Elisabeth Rosenthal, *Chinese Town's Main Export: Its Young Men,* N.Y. Times, June 26, 2000, at A1. Moreover, Chinese officials in 2000 were well aware of the United States's longstanding criticism of China's oppression of political dissidents. *See* Jane Perlez, *Albright Debates Rights and Trade with the Chinese,* N.Y. Times, March 2, 1999, at A1 (reporting that while meeting with Chinese President Jiang Zemin, Secretary of State Albright criticized China's crackdown on political opposition groups and imprisonment of political prisoners); Elizabeth Becker, *In a Stiff Rebuke, U.S. Accuses China of Abusing Rights,* N.Y. Times, February 27, 1999, at A1 (reporting that State Department issued a report containing "one of its harshest condemnations of Beijing to date and describ[ing] some of its most serious human rights violations in recent years" and that China "continues to keep several thousand political ... dissidents imprisoned"). Given these well known facts, the Chinese government might well have inferred from the presentation of the Certificate of Release to the Prison Bureau that Lin was in the United States seeking asylum.

The government asserts that we should presume that there was no disclosure of the fact that Lin had applied for asylum. Both the BIA's decision and the government's argument are couched in terms of presumptions. Since "the record does not reveal that any sensitive information was forwarded to Chinese officials for authentication," the BIA refused to presume that the INS breached Lin's confidentiality because "routine factual inquiries by United States officials, in and of themselves, may not be presumed to reveal that there is a pending asylum application by an alien." The government also urges that "[g]overnment officials are entitled to a presumption of regularity in the execution of their

duties, absent clear evidence to the contrary." Thus, the IJ should not have presumed that "the INS informed the Chinese Government that Petitioner was seeking asylum." We, however, do not see this case turning on "presumptions" because the government has conceded that it revealed "facts . . . that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum," which violates section 208.6. Whether or not the government official explicitly disclosed that Lin was seeking asylum is, in this case, irrelevant.

The government's second argument is that, as a matter of policy, "[i]t would be patently unreasonable to allow an alien to submit corroborative documentary evidence whose authenticity could not be questioned." (Appellee's Br. at 34.) According to the government, were Lin "to prevail, all safeguards to evidentiary authenticity would evaporate." *(Id.)* We do not foresee such dire consequences. As acknowledged by the Cooper Memo, "[m]any aspects of an asylum claim—including the occurrence of events central to the claim, the addresses and locations of such events, etc.—could be verified or disproved without disclosing the identity of the applicant or any details of his or her claim to anyone. If possible, such an approach is preferable." Cooper Memo at 4. Government investigators may make use of their internal resources, such as forensic document specialists,[5] that may be able to authenticate a document. *See, e.g., In re O–D–,* 21 I. & N. Dec. 1079, 1083 (BIA 1998) (affirming an adverse credibility finding based, in large part, on holding a report from the INS's Forensics Document Laboratory stating that an applicant's identity card was counterfeit).

Of course, investigators may be presented with a situation where they may need to verify information with the applicant's home country. The opinion of a foreign government, however, may be of limited probative value if the country has an ulterior motive to deny the existence of the document. As the Cooper Memo and the Asylum Manual make clear, investigators may contact a foreign government only as a last resort and only if confidentiality can be preserved. *See* Cooper Memo at 3 ("If an investigation cannot be accomplished without compromising the confidentiality of the application, the investigation should be abandoned and the investigator should inform the requestor of the investigation of this fact."); Asylum Manual at 30 ("Under certain (very rare) circumstances, an AO may . . . . contact a foreign embassy or consulate directly under the following conditions: The AO has exhausted all country conditions research sources available to him or her, and the relevant information cannot be obtained . . . . [and][t]he AO will not violate confidentiality provisions of 8 CFR 208.6.").

When contacting a foreign government is necessary, government personnel have a number of options that protect an applicant's confidentiality. First, investigators may redact information identifying the applicant from a document before submitting it to the foreign government.[6] *Cf. Ray,*

---

**5.** The INS indicated during Lin's hearing that it intended to submit the Certificate of Release to its forensic document lab.

**6.** It should be noted, however, that redaction still presents risks that the foreign government will be able to identify the applicant from the unredacted portions of the document. *See Dep't of Air Force v. Rose,* 425 U.S.

352, 381–82, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (holding that although "redaction cannot eliminate all risks of identifiability," it was a "familiar technique" and sufficient to protect the identities of Air Force Academy cadets described in summaries of disciplinary proceedings).

502 U.S. at 176, 112 S.Ct. 541 (approving the redaction of refugee's interview summaries because disclosure of their identity could subject the refugees to persecution upon repatriation). Second, the government may obtain a written waiver from the applicant, permitting the disclosure of his or her identity. *See* § 208.6(a). Third, in the presumably rare circumstances in which disclosure of an applicant's identity is required and the applicant refuses to provide written consent, the Attorney General may waive the strictures of 208.6. *See id.* Given these options and the government's ability to authenticate documents without contacting foreign governments, we do not foresee that enforcing section 208.6 in this case will impede the investigation and verification of asylum claims.

■ Finally, the government also argues that Lin waived any objection to its efforts to authenticate the Certificate of Release. This argument fails for two reasons. First, section 208.6(a) explicitly requires a written waiver, and holding that Lin had orally waived confidentiality is contrary to the plain language of the regulation.[7] Second, nowhere in the record, is there any indication that Lin consented to the disclosure of the Certificate of Release to officials of the Chinese government. The INS indicated first that it was going to submit the Certificate of Release to its own lab for forensic examination. At a later hearing, the government stated that it had faxed the document to State Department officials in Guangzhou. It was not unreasonable for Lin to assume that the government would follow its own regulations and the assurance of confidentiality provided in the instructions for completing an asylum application. *See* Instructions for Form I–589 Application for Asylum and for Withholding of Removal at 4 (rev. July 3, 2003) ("[N]o information indicating that you have applied for asylum will be provided to any government or country from which you claim a fear of persecution. Regulations at 8 CFR 208.6 protect the confidentiality of asylum claims."), *available at* http://www.uscis.gov/graphics/formsfee/forms/files/i–589.pdf (last visited July 25, 2006); *cf. Ray*, 502 U.S. at 177, 112 S.Ct. 541 (holding that assurances given by the government to maintain the anonymity of interviewed refugees militated against disclosure). The fact that Lin's counsel also sent documents to the State Department for authentication is of no moment because section 208.6 requires that, absent a written waiver, government officials maintain the confidentiality of an applicant's identity.

■ For these reasons, we hold that the BIA erred in concluding that the government had not violated section 208.6.[8] We recognize that the violation of a regulation does not necessarily require the vacatur of an order of removal. *See Johnson*

7. Even in other circumstances where the reason for disclosure is more compelling than authenticating a document, the government requires its officers to obtain written waiver. *See* Memorandum from Jeffrey Weiss, INS Acting Director of Int'l Affairs, to all Asylum Officers, Immigration Officers, Headquarters Coordinators, *Guidelines For Children's Asylum Claims* 5 n. 11 (requiring an Asylum Officer to obtain a written waiver from a child separated from her parents before notifying the parents that their child has applied for asylum), *available at* http://www.us- cis.gov/graphics/lawsregs/handbook/10a_ChldrnGdlns.pdf (last visited July 25, 2006).

8. We express no opinion as to whether it would be appropriate to discipline any employee for violating section 208.6. *Cf. Lewis v. Dep't of Justice*, 34 Fed.Appx. 774 (Fed.Cir. 2002) (unpublished opinion) (affirming decision of Merit Systems Protection Board concluding that breach of section 208.6 was a firing offense irrespective of whether that breach was harmless).

*v. Ashcroft,* 378 F.3d 164, 171 n. 9 (2004). The government's violation of section 208.6, however, is not merely a procedural flaw in an immigration proceeding. The government through its negligence has potentially exposed Lin and his family to risks beyond those that he claims caused him to flee China. *See Fengchu Chang v. INS,* 119 F.3d 1055, 1067–68 (3d Cir.1997) (considering possible knowledge by the Chinese government that the applicant sought asylum in assessing applicant's fear of persecution); *see also* Fact Sheet at 2 ("[P]ublic disclosure might, albeit in rare circumstances ... give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment."). The 2004 State Department Country Condition Report supports the possibility that Lin could be subject to persecution upon his repatriation: "Activists resident abroad have sometimes been imprisoned upon their return to the country.... Persons who were trafficked from the country and then repatriated sometimes faced fines for illegal immigration upon their return; after a second repatriation, such persons could be sentenced to reeducation through labor." U.S. Dep't of State, Country Reports on Human Rights Practices: China 2004 (February 28, 2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41640.htm (last visited July 25, 2006).

This new risk of persecution faced by Lin may, independent of his original claim, render him eligible for asylum and/or withholding of removal. On remand therefore, the BIA should consider the significant evidence—and any additional evidence Lin produces—that points to Lin having a well-founded fear of persecution based on the government's violation of section 208.6, as well as any reliable evidence that may be produced by the government to the contrary. *See In re Zhen Nan Lin,* No. A75 559 667 (Immig. Ct. N.Y. City May 1, 2002) (finding based on the current record that it was more likely than not that Lin would be subject to persecution if returned to China).

## C. The BIA's Reliance on the Consular Report

■■ Crediting the Consular Report's conclusion that the Certificate of Release was a forgery, the BIA held that Lin's testimony was not credible because he submitted a fraudulent document. *See In re O–D–,* 21 I. & N. Dec. 1079, 1083 (BIA 1998). On appeal, Lin argues that the BIA's adverse credibility finding is not supported by substantial evidence because the Consular Report is unreliable. Specifically, he contends that because the Prison Bureau knew that the Certificate of Release was related to his asylum application, its response that the document is a forgery is not trustworthy.

■■ The government is not required to comply with either the requirements of the Federal Rules of Evidence or the heightened procedural protections of a criminal trial when seeking to have documentary evidence, such as the Consular Report, admitted in a removal proceeding. *See Felzcerek v. INS,* 75 F.3d 112, 115 (2d Cir.1996). Evidence is admissible provided that it does not violate the alien's right to due process of law. *See id.* Evidence may be admitted in accordance with the standard for due process "if it is probative and its use is fundamentally fair." *Montero v. INS,* 124 F.3d 381, 385–86 (2d Cir. 1997). Fairness in this context "is closely related to the reliability and trustworthiness of the evidence." *Id.* at 386 (internal quotation marks omitted).

Other circuits have found due process violations where the IJ's or BIA's reliance on investigative reports was fundamentally unfair because the documents were unreliable. In *Ezeagwuna v. Ashcroft,* the government submitted and the agency relied upon, a two-page letter from the State Department's Director of the Office of Country Reports and Asylum Affairs concluding that documents submitted by a Cameroonian national seeking asylum were forgeries. 325 F.3d 396, 406 (3d Cir.2003). The letter, however, reported "statements and conduct of three declarants who [were] far removed from the evidence sought to be introduced." *Id.* Moreover, the State Department letter provided the adjudicator "absolutely no information about what the 'investigation' consisted of, or how the investigation was conducted." *Id.* at 408. The Third Circuit held that, in these circumstances, the agency's reliance on the State Department letter was fundamentally unfair.

The Sixth Circuit, similarly, vacated an IJ's finding of frivolousness based on unreliable memoranda from the United States embassy in Sofia, Bulgaria reporting that documents submitted by the applicant were fraudulent. *Alexandrov v. Gonzales,* 442 F.3d 395, 404 (6th Cir.2006). The court held that the memoranda were untrustworthy and unreliable because they did not "clarify to any degree what type of investigation was conducted . . . . [or anything] aside from the apparent conclusions of the mysterious investigation." *Id.* at 407; *cf. Borovikova v. U.S. Dep't of Justice,* 435 F.3d 151, 157–58 (2d Cir.2006) (holding that a sworn affidavit from the INS employee specifying the defects and inconsistencies in the submitted documents was sufficient to support the IJ's adverse credibility finding).

Although we find the logic of these cases persuasive, we do not reach the constitutional issue presented because the *statutory* standard of review requires vacatur. *See Nicholson v. Scoppetta,* 344 F.3d 154, 170 (2d Cir.2003) ("[W]e must avoid unnecessary constitutional adjudication."). Under 8 U.S.C. § 1252(b)(4)(B), "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We, therefore, "defer to the factual findings of the BIA and the IJ if they are supported by substantial evidence." [9] *Zhou Yun Zhang v. INS,* 386 F.3d 66, 73 (2d Cir.2004).

■ Like any other adverse factual finding, the BIA's conclusion that an applicant has filed a forged document must be supported by substantial evidence. *See Borovikova,* 435 F.3d at 156–57. Evidence that is unreliable cannot provide the substantial evidentiary support necessary to sustain the agency's finding. *See Ramsameachire v. Ashcroft,* 357 F.3d 169, 179 (2d Cir.2004) (requiring that the record of an alien's airport interview be sufficiently reliable "before concluding that it represents a sufficiently accurate record of the alien's statements to merit consideration in determining whether the alien is credible.").

For the many reasons present in this case, we find the Consular Report to be highly unreliable and therefore insufficient to satisfy the substantial evidence requirement. We agree with the IJ that the Consular Report is entirely based on the opinions of Chinese government officials who appear to have powerful incentives to be less than candid on the subject of their

---

**9.** Even though the phrase "substantial evidence" was removed from the statutory text, we have held that it remains the standard.

*See Xiao Ji Chen v. U.S. Dep't of Justice,* 434 F.3d 144, 157 (2d Cir.2006).

government's persecution of political dissidents. As discussed above, the Certificate of Release is a type of document that, when presented by a U.S. immigration official, gives rise to a strong inference that the prisoner is seeking asylum. Moreover, the State Department has reported, the Chinese Government has consistently,

> den[ied] holding any political prisoners, asserting that authorities detain persons not for their political or religious views, but because they violate the law. However, the authorities continued to confine citizens for political and religious reasons. It is estimated that thousands of political prisoners remain incarcerated, some in prisons and others in labor camps.

U.S. Dep't of State, Country Reports on Human Rights Practices: China 2000 (February 23, 2001), *available at* http://www.state.gov/g/drl/rls/hrrpt/2000/eap/684.htmChina2000 (last visited July 25, 2006); *see also* U.S. Dep't of State, Country Reports on Human Rights Practices: China 2005 (March 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61606.htm (last visited July 25, 2006). Asking the Prison Bureau to authenticate a document that on its face corroborates an alien's claim of persecution is tantamount to asking whether its country engages in human rights violations.

Given the Chinese government's motive to conceal their policies towards political dissidents, the IJ was correct in concluding that its "response could have been intended to frustrate [Lin's] asylum claim by denying authenticity of his documents." As stated above, the government may, in appropriate circumstances, submit a document to a foreign nation for authentication. Many documents, such as birth certificates, marriage licenses, or even some court records, do not necessarily imply

that a foreign national is seeking asylum. Where, as here, the document at issue, if authentic, is evidence that a foreign government violated human rights, that government's "opinion" as to the document's authenticity is obviously suspect and therefore of questionable probative value.

■ Additionally, the Consular Report is insufficiently detailed to permit a reviewing court to assess its reliability. Reports from overseas State Department or immigration officials regarding the authenticity of documents are highly probative and, indeed, often necessary for the proper adjudication of an asylum claim. We have declined in the past to set rigid requirements for the contents of government reports on the authenticity of document. *See Borovikova*, 435 F.3d at 157 (noting that "[a]lthough certain reports deserve greater deference than others," the fact that a report did not contain a forensic analysis was irrelevant). Nonetheless, there are some standards. In the context of airport interviews, the BIA has held that the record must be sufficiently detailed because "[t]he Board needs to know what transpired in the proceedings before the asylum officer before we can evaluate questions with respect to credibility arising from the interview." *In re S–S–*, 21 I. & N. Dec. 121, 124 (BIA 1995). Similarly, a report regarding the authenticity of a document must contain sufficient detail to allow for the reviewing court to evaluate whether the report is reliable.

The Department of Justice itself has recognized the need for a detailed report: "A report that is simply a short statement that an investigator has determined an application to be fraudulent is of little benefit. Instead, the report should lay a proper foundation for its conclusion by reciting those factual steps taken by the investigator that caused the investigator to reach his or her conclusion." Cooper

Memo at 6. The Cooper Memo provides guidelines for government officials preparing investigative reports:

> In the case of a fraudulent document, a comprehensive and, therefore, effective report will lead the adjudicator down the path taken by the investigator, and hopefully help the adjudicator reach the same conclusion. Such a report must contain, at a minimum:
>
> (i) the name and title of the investigator;
>
> (ii) a statement that the investigator is fluent in the relevant language(s) or that he or she used a translator who is fluent in the relevant language(s);
>
> (iii) any other statements of the competency of the investigator and the translator deemed appropriate under the circumstances (such as education, years of experience in the field, familiarity with the geographic terrain, etc.);
>
> (iv) the specific objective of the investigation;
>
> (v) the locations of any conversations or other searches conducted;
>
> (vi) the name(s) and title(s) of the people spoken to in the course of the investigation;
>
> (vii) the method used to verify the information;
>
> (viii) the circumstances, content, and results of each relevant conversation or search[ ]; and
>
> (ix) a statement that the Service investigator is aware of the confidentiality provisions found in 8 C.F.R. § 208.6.

Cooper Memo at 6–7. At least three useful factors may be distilled from this memorandum: (i) the identity and qualifications of the investigator(s); (ii) the objective and extent of the investigation; and (iii) the methods used to verify the information discovered. While these factors are non-exhaustive, they provide an analytical framework for assessing the reliability of an investigative report. *See Ramsameachire*, 357 F.3d at 180 (finding four nonexhaustive factors provided an analytical framework for determining the reliability of an airport interview).

Using these factors as a guide, we find the Consular Report to be woefully insufficient to support on its own the conclusion that the Certificate of Release is a forgery. Considering the first factor, although we know the names and titles of the investigators, we have no information regarding their competency or qualifications.[10] Further, the Liu Report does not indicate who received the phone call from Prison Bureau relating the critical information that

---

**10.** Susanna Liu is the "author" of the investigative report, but like in *Alexandrov*, there is no indication that she actually performed the investigation or spoke with the Prison officials. *See* 442 F.3d at 407 (noting that the record did not disclose whether the authors of the memoranda participated in the investigations). Although the report lacks a statement of Liu's qualifications as an investigator, we take notice of the fact that this is not the first time that her reports have been found to be wanting in detail. Liu was the investigator in the case of *Qiu Rong Lin v. Ashcroft*, where the Third Circuit held that a report concerning the authenticity of an abortion certificate was unreliable. *See* 83 Fed.Appx. 480, 485 (3d Cir. Dec.22, 2003) (unpublished). The report was authored by an unnamed person, transmitted to Liu by a doctor in another province, and lacked any indication of how the investigation was actually conducted. *Id.* In another Third Circuit case, Judge Becker noted that an investigative report prepared by Liu was "unclear [on] who conducted the initial investigation, whether the author of the investigation report had any first hand knowledge of the investigation itself, or how the investigation was actually conducted." *Gui Ying Chen v. Attorney General of the U.S.*, 2005 U.S.App. LEXIS 21468, *13 n. 2 (3d Cir. Oct. 3, 2005) (Becker, J. *concurring*).

there is no Prison Number 7 prison in Guangzhou. *See Alexandrov*, 442 F.3d at 407 ("We do not know who the investigator was or if there was more than one investigation or the qualifications of a supposed investigator").

Second, although the objective of the investigation is clear, the Consular Report fails to indicate where or when the phone call from the Prison Bureau was received. The Consular Report does not state the names or titles of the people spoken to at the Prison Bureau. *See Alexandrov*, 442 F.3d at 407 (finding the memoranda unreliable because, in part, they failed to indicate who provided the investigator with information about the authenticity of the documents). We do not know when this conversation occurred or whether it was conducted in English or Chinese. It is, therefore, unclear whether whoever spoke to the prison official understood and accurately relayed the conversation to Liu.

Third, the Consular Report does not discuss the methods used to verify the information from the Prison Bureau. While the nonexistence of prison number seven would constitute substantial evidence that the Certificate of Release was a forgery, the record does not disclose that any government official attempted to verify whether prison number seven existed or provide some explanation why such a verification was impossible or unduly burdensome. *See id.* (noting with concern that both the memorandum and the testimony of the embassy official failed to confirm whether the judge listed on the court judgment existed); *Ezeagwuna*, 325 F.3d at 408 (noting with concern that the investigator failed to attempt to "locate the individual who supposedly signed the warrant, or confirm through authorities that such person existed"). We do not purport to know whether the existence of a Chinese prison is an easy fact to verify, but, if it is

not, the report at least must explain why verification is not possible.

■ In addition to the other deficiencies noted above, the Consular Report contains multiple hearsay statements that further degrade its reliability. Hearsay is admissible in removal hearings, not because it is reliable, but because the standard for admission of evidence is lower than in a traditional civil proceeding. *See Felzcerek*, 75 F.3d at 115. Here, the Steiner Letter is certainly hearsay as it was offered to prove the Certificate of Release is counterfeit. Moreover, the source of the information, given the Prison Bureau's motivation to be less than candid on the subject, is highly unreliable, and the lack of any corroborating detail from U.S. officials indicate a severe lack of trustworthiness. *Cf.* Fed.R.Evid. 803(8)(c). The Liu Report, is even more unreliable than the Steiner Letter, as it contains multiple levels of hearsay that exacerbate its myriad reliability problems.

For all of these reasons, we hold that the Consular Report is inherently unreliable and cannot support the BIA's adverse credibility finding.

## II. Withholding of Removal and CAT Claims

As the BIA's reversal of the IJ's grant of withholding of removal is predicated on the erroneous adverse credibility finding, we remand Lin's withholding of removal for reconsideration by the BIA. *See Pavlova v. INS*, 441 F.3d 82, 92 (2d Cir.2006) (vacating withholding and CAT determinations that were premised on the same erroneous adverse credibility finding as the asylum claim). Lin argues in his brief that he is entitled to relief under the Convention Against Torture (CAT). Lin has never before requested this type of relief, and therefore, he has failed to exhaust his ad-

ministrative remedies. *See Gill v. INS*, 420 F.3d 82, 86 (2d Cir.2005)

## CONCLUSION

For the foregoing reasons, we will GRANT the petition for review, and REMAND this case to the BIA for further proceedings consistent with this opinion. The stay of removal that the Court granted in this petition is VACATED.