**DA TONG PENG, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

No. 08–2800.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) July 29, 2009.

Opinion filed: Aug. 5, 2009.

Man C. Yam, Esq., Law Offices of Bernard & Yam, New York, NY, for Petitioner.

Kevin J. Conway, Esq., Allen W. Hausman, Esq., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before: BARRY, SMITH and HARDIMAN, Circuit Judges.

## OPINION

PER CURIAM.

Da Tong Peng petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") final order of removal. For the reasons that follow, we will deny his petition.

### I.

Peng, a native and citizen of China, entered the United States on October 21, 2000 on a nonimmigrant business visitor's visa, which he overstayed without authorization. On February 14, 2001, he applied for asylum, withholding of removal and relief under the Convention Against Torture ("CAT"). He was placed into removal proceedings in March 2001. Following a hearing on November 3, 2003, the IJ denied relief. On appeal, the BIA remanded the record back to the IJ "for a clear credibility determination," and stated that the parties could provide additional evidence on remand. On August 28, 2006, a second hearing was conducted before a new IJ. Peng submitted additional corroborating exhibits, including a medical record and a letter from his wife in China. The IJ again denied Peng's requests for relief, and the BIA adopted and affirmed the IJ's decision. Peng filed a petition for review.

The IJ based his denial of relief on his conclusion that Peng was not a credible witness. (App.34, 44–47.) This finding was based primarily on three pieces of evidence: the letter from Peng's wife, the consular investigation, and the "serious and material inconsistencies" between Peng's original and amended asylum applications. (App.34–35.) Peng submitted a letter from his wife dated March 26, 2005, which he testified was written in response to the BIA's instruction to submit additional evidence on remand. (App.164.) At the conclusion of the letter, Peng's wife wrote: "Attached is the Photocopy of Proof of Hospitalization, CT diagnosis, bone fracture pictures, and medical condition, & c." (App.239.) The IJ found these statements troubling, as he explained:

In addition, the wife's affidavit specifically mentioned after her alleged signature, attached is the photocopy of proof of hospitalization, C.T. diagnosis, bone fracture, pictures, and medical conditions certification, and etc. Again, none of those records of a bone fracture, a C.T. diagnosis were ever[ ] provided to this Court. The respondent's wife did not provide them with the letter that was provided to this Court. In fact, the only medical record provided to this Court was related to the respondent suffering allegedly some form of pneumonia which he argued was somehow related to the treatment he received [at] the hands of the Chinese police for his allegedly practicing of falun gong.

The Court finds it significant that when you review respondent's two affidavits that were provided to this Court, neither one of them mentions bone fractures or the need apparently for a CAT scan. Neither one of them mentions that the respondent had a CAT scan. This raises serious concerns for this Court as to the credibility which goes to the heart of this case. The Court is specifically referring to Exhibit 3, the first detailed affidavit provided by the respondent as well as a subsequent amended affidavit, Exhibit 7. Therefore, the wife's letter grays [sic] serious and material issues for this Court when considering the credibility of the respondent.

(App.35–36.)

Next the IJ addressed the consular investigation into the authenticity of three documents submitted by Peng in support

of his asylum claim: a Letter of Appointment from his alleged former employer dated November 11, 2007 (App.457–58), a Certificate of Search Number 537 (App. 460–61), and a Subpoena Number 843 (App.463–64), both dated November 2000 and issued by the Chengdu City Public Security Bureau. He testified that his wife provided these documents to him, but he did not know how they came to be in her possession. (App.137, 168–69.) She did not address this issue in her letter or any other document of record. (App.238–39.) The investigation was conducted by Julia Feng, a Foreign Service National Investigator of the U.S. Immigration and Naturalization Service ("INS"), on May 14, 2002. After Ms. Feng was unable to find the phone number for Peng's alleged former employer, "Si Chuan Provincial Key Constructions the Industry and Commerce Limited", she contacted Cheng Du District Shen Xian Shu Officials and Veterans Training Center. The person she spoke to stated that he had never heard of that organization. (App.395.) Next Ms. Feng attempted to ascertain the authenticity of the "search" and "subpoena" documents by contacting the Cheng Du City Public Security Bureau. (*Id.*) She faxed redacted copies of the "search" and "subpoena" documents to Mr. Yang Nan Jun, Duty Officer at the Operation Center, who informed her that the documents did not conform to those used by the Cheng Du City Public Security Bureau because: (1) the header did not contain the full name "People's Republic of China Criminal Procedural Laws" and (2) the format generally differed from that of authentic versions of the

documents. (App.395–96.) For further confirmation, Ms. Feng contacted several other local public securities in mainland China and obtained samples of their search and subpoena certificates, which she concluded were totally different from the ones submitted by petitioner. (App. 396.) The IJ found Ms. Feng's conclusion that Peng's documents appeared to be fraudulent to be "compelling". (App.38.)

Finally, the IJ contrasted the two asylum affidavits provided by Peng. In his first affidavit, which he submitted with his asylum application dated September 1, 2001, Peng stated that he was forced "to go to a meeting to 'study'" and was "required to write criticisms of Falun Gong and our confessions," and that since then, all of his construction projects were terminated and he was not paid for his finished projects. (App.442.) He did not allege any physical harm.[1] In his second affidavit, dated January 10, 2003, he alleged:

7. At around 9:30 in the evening on December 25, 1999, two plain clothed police officers took me from my house to Xiaotianzhu Police Station. At the Police Station, another uniformed police officers interrogated me. During the interrogation, I was beaten in my legs by another plain-clothes officer with a bamboo stick. I was released at around midnight, and told to provide a detailed report to the police station. After I was released, I could see blackened marks on both my legs.

8. Because I didn't submit the report as they required, the next day, I was taken to Xiaotianzhu Police Station again at around 9:00 p.m. for interroga-

---

1. However, Peng did state: "On April 21, 2000, I was arrested by the Security Department of Chengdu Military District and then transferred to Chengdu City, Public Security Bureau. I was sick and collapsed. The police sent me to the emergency room in the hospital on May 7th. Three days later, I was allowed to go home and recover. During that time, I prepared to escape from China. On October 22, I left for the U.S. Soon after I left, the Chinese Government issued a warrant for my arrest and searched my home for me." (App.442.)

124

tion. During this interrogation, I was beaten and tortured for even longer and more severe than the previous one. I was beaten by bamboo sticks. The officer(s) also made me sit in a chair, and suddenly pushed the chair on the ground with me in it. The fall made the back of my head swollen and in pain. After my wife guaranteed that I would not practice Falun Gong anymore, I was released at around 3:00 a.m. on December 27, 1999. My legs and hands all bled from the beating and torture.

. . .

11. On April 21, 2000, at around 1:00 p.m., three uniformed military officers came to my house, and took me to a facility in the Military District, where I was continuously interrogated and tortured daily. From April 21, 2000 to April 24, the military officers tortured me by forcing me to perform a military stand continuously. I was also refused to be given water to drink.

12. On April 24, 2000, three police officers transported me to a police facility, where I was detained until April 30, 2000. I was interrogated daily during this detention.

13. On April 30, 2000, I was escorted to the Emergency Room of No. 3 Hospital of Chengdu because of pneumonia. I was discharged by the hospital on May 2, 2000. After I left the hospital, my wife sent me to a rented place in Tai'an Township, until I finally managed to get out of China on October 20, 2000.

(App.389–90.) Based on the differences between the two statements, the IJ concluded that, when taken in conjunction with his wife's letter, the "material misstatements or omissions" compelled the Court to reach "a negative credibility finding." (App.42.)

In light of his adverse credibility determination, the IJ concluded that Peng could not meet his burden of demonstrating past or future persecution and, accordingly, denied all forms of relief and ordered Peng removed to China. The BIA adopted and affirmed the IJ's determination, finding that the IJ's adverse credibility determination was amply supported by the record and that Peng failed to meet his burden of proving that the documents submitted in support of his claims were authentic.

II.

We have jurisdiction over this petition for review under 8 U.S.C. § 1252. To be granted asylum as a refugee, an applicant must establish that she is unable or unwilling to return to her homeland "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To be entitled to withholding of removal, an applicant must prove that her "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3). An applicant for either form of relief must offer "credible, direct and specific evidence" in support of her claim. See Chen v. Ashcroft, 376 F.3d 215, 223 (3d Cir.2004); Balasubramanrim v. INS, 143 F.3d 157, 165 (3d Cir.1998).

The IJ denied relief because he found that Peng was not credible. Because the BIA adopted the adverse credibility finding made by the IJ, we review both determinations at this time. See Chen, 376 F.3d at 222; Voci v. Gonzales, 409 F.3d 607, 612 (3d Cir.2005). The adverse credibility determination is a factual finding subject to review under the substantial evidence standard. See Kaita v. Attorney General, 522 F.3d 288, 296 (3d Cir.2008). "Under this deferential standard of review, we must uphold the credibility determination

of the BIA or IJ unless 'any reasonable adjudicator would be compelled to conclude to the contrary.'" *Chen,* 376 F.3d at 222 (quoting 8 U.S.C. § 1252(b)(4)(B)). However, an adverse credibility finding based on inconsistencies in the record must be based on matters that go to the heart of the asylum claim.[2] *See Kaita,* 522 F.3d at 296.

## III.

■ Based on a thorough review of the record, we conclude that the IJ's adverse credibility finding is supported by substantial evidence, as is thoroughly summarized in the IJ's decision.

■ Peng's remaining claims relate to the fraud investigation conducted by the INS. First Peng claims that, in faxing a copy of the search and subpoena documents to the Cheng Du City Public Security Bureau, the Government violated 8 C.F.R. § 208.6, which bars the Government from disclosing information to a foreign government which would indicate that one of its citizens or nationals has applied for asylum in the United States. Peng did not raise this issue before the IJ, but he did present it to the BIA, which concluded that there was "insufficient support for respondent's claim that the rules regarding confidentiality were breached during the investigation." (App.2–3.) In her report, Ms. Feng stated that she redacted petitioner's name before faxing the search and subpoena documents to the Cheng Du City Public Security Bureau. (App.395.) Nonetheless, Peng argues that "both the search certificate and the subpoena con-

tained other identifying information such as document numbers, Mr. Peng's home address and the name of the detectives and officers assigned to the case." (Pet'r Br. 8.) As the Government points out in its brief, however, there is no evidence in the record to indicate that this information was not redacted. (Resp't Br. 32–33.) The consular report was introduced against Peng during his first IJ hearing in 2003. His second hearing did not take place until 2006. During this time he had ample opportunity to sufficiently develop the factual basis for his claim. For example, he could have requested copies of the redacted versions of the documents as they appeared when faxed or sought additional information from Ms. Feng regarding the contents of the documents or her methods of conducting the investigation. *See* 8 U.S.C. § 1229a(b)(1); 8 C.F.R. § 1003.35(b). As he failed to develop any factual record to support his claim, we cannot conclude, based on the record before us, that such a violation has occurred. *Compare with Corovic v. Mukasey,* 519 F.3d 90, 95 (2d Cir.2008) & *Zhen Nan Lin v. United States Department of Justice,* 459 F.3d 255, 260–61 (2d Cir.2006).

Additionally, Peng does not indicate what the remedy for any such violation would be. In *Corovic v. Mukasey,* 519 F.3d 90 (2d Cir.2008), the Second Circuit held:

> [A] violation of section 208.6 could compel this Court, as it did in *Zhen Nan Lin* to "hold that the Consular Report [produced by the foreign government] is inherently unreliable and cannot support the BIA's adverse credibility finding."

**2.** In enacting the Real ID Act of 2005, Congress changed the credibility determination standard. *See* Real ID Act of 2005, Pub.L. No. 109–13, Div. B, § 101, 119 Stat. 231 (May 11, 2005), codified at 8 U.S.C. § 1158(b)(1)(B)(iii). However, this new provision only applies to applications for relief

filed after May 11, 2005, the effective date of the Act. *See id.* As the Government concedes, these changes are not applicable to the instant petition, as Peng filed his application for relief prior to that date. *See Chukwu v. Attorney General,* 484 F.3d 185, 189 (3d Cir.2007).

*Id.* at 272. In the alternative, it might compel us to remand to the IJ for a new determination as to whether the document it submitted for verification is, in fact, fraudulent. *Zhen Nan Lin* further recognized that, in violating section 208.6, "[t]he government through its negligence has potentially exposed [the petitioner] and his family to risks beyond those that ... caused [them] to flee." *Id.* at 268. We therefore remanded that case, ordering that, on remand, the BIA evaluate the arguable risk of persecution, independent of the original claim for asylum and withholding of removal, arising from the government's violation of section 208.6. *Id.* at 96. In the instant case, even assuming that such a violation occurred, in light of the overwhelming evidence supporting the IJ's determination that Peng was not credible, we can see no reason to remand for a re-assessment of Peng's credibility without the consular report. The IJ's adverse credibility determination relied heavily on the conflict between Peng's first and second asylum affidavits, the unresolved issues raised by his wife's letter, and the failure of both Peng and his wife to identify the origins of the documents he submitted in support of his claim. There is no reason to believe that a re-evaluation of the evidence on remand would produce a different result. *See id.* ("Because the IJ's finding of fraud with respect to the Court decision was based on evidence other than Exhibit 7, however, the exclusion of Exhibit 7 would not necessarily have altered the IJ's conclusion that the Court Decision was fraudulent ... We conclude, therefore, that this error is not a basis for remand."). Finally, Peng has failed to make any argument that he might now be eligible for asylum, withholding or CAT relief based on any alleged violation of § 208.6. *See Zhen Nan Lin,* 459 F.3d at 263.

Finally, Peng argues that the admission of the consular report violated his right to due process as it was inherently unreliable and contained multiple levels of hearsay. In *Ezeagwuna v. Ashcroft,* 325 F.3d 396 (3d Cir.2003), we concluded that the BIA had violated petitioner's right to due process by basing its adverse credibility determination almost entirely on a State Department letter summarizing the results of a consular investigation. *See id.* at 408. As we explained, "[b]ecause the Federal Rules of Evidence do not apply in asylum proceedings, '[t]he test for admissibility of evidence ... is whether the evidence is probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law.'" *Id.* at 405 (quoting *Bustos–Torres v. INS,* 898 F.2d 1053, 1055 (5th Cir.1990)). The instant case is readily distinguishable from *Ezeagwuna,* as Peng had access to the report for several years prior to his second hearing and, therefore, had ample time to collect and present rebuttal evidence, which he failed to do. Additionally, the report in this case came directly from the investigator, who provided information regarding her background, explained how the investigation was conducted, and related what she had learned based on her own conversations with officials of the Chinese government. *Compare id.* at 406–08. Additionally, as we have already explained, the IJ relied on much more than merely the consular report in determining that Peng was not credible.

Based on the foregoing, we will deny the petition for review.