PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMR ALI ABDEL-RAHMAN,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney General,

*Respondent.*

No. 06-1619

On Petition for Review of an Order of
the Board of Immigration Appeals.
(A77-045-405)

Argued: March 16, 2007

Decided: July 12, 2007

Before WILLIAMS, Chief Judge, and KING
and DUNCAN, Circuit Judges.

Petition for review denied by published opinion. Judge King wrote the opinion, in which Chief Judge Williams and Judge Duncan joined.

## COUNSEL

**ARGUED:** Andres Cayetano Benach, MAGGIO & KATTAR, Washington, D.C., for Petitioner. Daniel Eric Goldman, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent. **ON BRIEF:** Michael Maggio, Melissa Frisk, MAGGIO & KATTAR, Washington, D.C., for Petitioner. Peter D. Keisler, Assistant Attorney General, Civil Division,

M. Jocelyn Lopez Wright, Assistant Director, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent.

## OPINION

KING, Circuit Judge:

Petitioner Amr Abdel Rahman Ali, an Egyptian Army deserter, seeks our review of an Order of the Board of Immigration Appeals (the "BIA"), entered May 2, 2006, denying his application for asylum and withholding of removal.[1] Ali maintains that the BIA erred in two respects in denying his requests for asylum and withholding of removal. First, Ali asserts that the BIA erroneously decided that he had not established a well-founded fear of persecution on the basis of his actual or imputed political opinions. Second, Ali contends that the BIA erred in ruling that a disclosure to Egyptian officials by the Department of Homeland Security (the "DHS") that he was applying for asylum in this country failed to establish an independent ground for relief. As explained below, we reject these contentions and deny the petition for review.

### I.

### A.

Ali is a citizen of Egypt who entered the United States on June 27, 2004, on a diplomatic visa. As a Major in the Egyptian Army, Ali came to this country to undergo training at the United States Army's Logistics Management College in Fort Lee, Virginia. When Ali over-stayed his visa and failed to depart the United States in October 2004, the DHS detained him and charged that he was removable under the Immigration and Nationality Act (the "INA"). In June 2005, Ali appeared before an Immigration Judge (the "IJ") in Arlington, Vir-

---

[1]Although the style of this proceeding designates the petitioner as "Amr Ali Abdel-Rahman," his correct name appears to be "Amr Abdel Rahman Ali." We refer to him simply as "Ali."

ginia, where he conceded removability and filed an application for relief under the INA (the "Application"). More specifically, Ali sought three types of relief — asylum, withholding of removal, and protection under the United Nations Convention Against Torture (the "CAT").[2] In support thereof, Ali contends that he will be persecuted, tortured, and possibly even executed if he is returned to Egypt. According to Ali, he is and will be perceived by the Egyptian government to possess pro-Israeli political opinions because he married an American woman of Jewish descent, applied for asylum in the United States, and deserted his high-ranking, sensitive position in the Egyptian Army.

The IJ conducted a merits hearing concerning Ali's Application on September 27, 2005 (the "IJ hearing"). By his order of December 6, 2005, the IJ denied Ali's requests for asylum and withholding of removal (the "IJ Order").[3] On the other hand, the IJ Order granted Ali's request for protection under the CAT, concluding that "it is more likely than not that upon his return to Egypt, [Ali] would be detained and tortured by the Egyptian government to punish him for deserting the Egyptian army and to extract information from him on what he may have revealed while in the United States." IJ Order 21. Ali thereafter appealed to the BIA from the IJ Order's denial of asylum and withholding of removal, and the DHS cross-appealed to the BIA on the IJ Order's award of CAT relief. On May 2, 2006, the BIA affirmed the IJ Order in all respects (the "BIA Order").[4] In this proceeding, we assess Ali's requests for asylum and withholding of

---

[2]Applicants for asylum and related forms of relief are obliged to complete and appropriately file DHS Form I-589, entitled "Application for Asylum and for Withholding of Removal," together with supporting evidence. The filing of this single application form permits the applicant to request three forms of relief — asylum, withholding of removal, and protection under the CAT. *See* 8 C.F.R. § 208.3. Ali completed and filed his Application in June 2005, requesting all three forms of relief. *See* J.A. 278-87. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties.)

[3]The IJ Order is found at J.A. 1271-91.

[4]The BIA Order is found at J.A. 1377-79.

removal only, as the Attorney General has not sought review of the BIA's affirmance of the IJ Order's award of CAT relief.[5]

## B.

Ali, who entered the Egyptian Army in 1985 and attended military school in Cairo, rose to the rank of Major and served as a computer engineer prior to his 2004 arrival in the United States.[6] He contends that his Egyptian Army office handled "[m]any of the most important and sensitive matters of what was going on in Egypt." J.A. 574. In testifying at the IJ hearing, Ali explained that his office received "information about the Egyptian military capabilities," including information regarding military relations with Israel. *Id.* at 344-49. Ali described living in Egypt as a "good life" with "many of the privileges of being an officer in the Egyptian Army." *Id.* at 575. He reported getting along well with his fellow soldiers and enjoying his service in the Egyptian Army. Ali's only reason for coming to the United States was to attend training at Fort Lee from approximately July to October 2004.

Once in the United States, Ali decided to stay beyond the term of his visa because of his relationship with Kelly Stine, an American he met during his training in this country and whom he married on November 8, 2004. Ali asserted that he could not leave his new wife behind in the United States and that she would not be allowed to live with him in Egypt. For this reason, Ali "decided to divorce my [Egyptian] wife, not return home, and stay in the United States to be with Kelly." J.A. 575. Although not herself Jewish, Stine testified that the ethnic and religious origin of her family name is Jewish and German.[7]

---

[5]Although the IJ and BIA Orders do not spell out the specific relief awarded to Ali under the CAT, such relief is generally "granted either in the form of withholding of removal or in the form of deferral of removal." 8 C.F.R. § 208.16(c)(4).

[6]The facts underlying this proceeding are drawn from the administrative record. We rely to a substantial extent on Ali's own testimony, which the IJ found credible. *See* IJ Order 16-17.

[7]There is some indication in the record that Ali may have been corresponding with Stine prior to his arrival in the United States. This point

When Ali failed to return to Egypt following his 2004 training program at Fort Lee, various Egyptian officials began to communicate with the DHS seeking Ali's return. These communications, occurring as early as November 2004, reflect that Ali was deemed absent without leave ("AWOL") from the Egyptian Army, and that he was believed to have committed the Egyptian offenses of military desertion, fraud in connection with his Egyptian marriage, and causing Egypt to lose the cost of his military training and travel. These communications urged that the necessary steps be taken to return Ali to Egypt, and warned that "Mr. Ali is a security risk to the United States." J.A. 603. In addition, a DHS agent testified at the IJ hearing that, during the preceding year, she had spoken with the Egyptian Embassy about Ali at least five times, including an August 2005 conversation in which she revealed to her Embassy contact that Ali was seeking asylum in this country.

Ali asserted that the Egyptian government's efforts to ensure his return to Egypt demonstrate an interest in his circumstances beyond that ordinarily accorded a military deserter, and that these efforts support his contention that he will face persecution in Egypt. In addition to the potential punishment that he faces for desertion, fraud, and causing losses to the Egyptian military, Ali contended that he will be persecuted in Egypt for his "actual and imputed political opinion[s]." Petr.'s Br. 14. According to Ali, the Egyptian government will impute pro-Israeli political opinions to him because of his marriage to Stine, because he sought asylum in the United States, and because of his desertion from the Egyptian Army. Ali asserted that, upon returning to Egypt, he will be subjected to various types of torture, including simulated drownings, cigarette burns, severe beatings with rubber sticks, electric shocks, and sexual assaults. Although his work in the Egyptian Army did not involve the punishment of accused deserters, Ali recalled his "co-workers joking about how when the military

_____

of dispute has no bearing on Ali's requests for asylum and withholding of removal, and we need not resolve it. We also do not seek herein to assess or determine the validity of Ali's marriage to Stine, the timing of his divorce from his Egyptian wife, or the facts surrounding bigamy and perjury charges initiated against him by the Commonwealth of Virginia.

found such men, they would face torture for their disloyalty." J.A. 574.

To substantiate his fear of persecution upon returning to Egypt, Ali presented the IJ with the testimony of an expert on Egyptian law and practice and human rights issues. That witness, a Mr. Sadek, was born in Egypt and became a citizen of the United States after arriving in 1999. He testified that torture is systemic and ongoing in Egypt and that the Egyptian legal system will not protect Ali from it. Sadek confirmed that Ali "will be treated by the Egyptian authorities as a defector and will be subjected to severe torture during the interrogation process to ascertain whether he has disclosed any sensitive military information to any foreign intelligence services." J.A. 592. Sadek also testified that Ali will face persecution in Egypt because he applied for asylum in the United States.[8]

According to Sadek, the Egyptian government would "cut [Ali] to pieces" because he married Stine, due to her Jewish last name. J.A. 459. This is so, Sadek said, because "Jews are the enemy of the Egyptians and the Arabs, and this is mentioned in the Koran." *Id.* For these reasons, Ali faces "a very real and significant threat of persecution and torture by the Egyptian government." *Id.* at 585. Sadek admitted, however, that before the Egyptian government would charge Ali with being a spy because of his wife, it would first investigate her identity and religion. Sadek also opined that Egyptian military officers undergoing training in the United States are generally under scrutiny by the Egyptian authorities, especially the Embassy, and that such authorities would be aware of any asylum applications filed by such officers.

## II.

The decisions of the BIA concerning asylum eligibility or withholding of removal are deemed conclusive "if supported by reasonable, substantial and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (citations

---

[8]Sadek explained that the Egyptian Criminal Code provides for charges of espionage against members of the Egyptian military who seek asylum in a foreign country. Sadek asserted that this offense is punishable by death.

and internal quotation marks omitted). As we have heretofore recognized, "[w]e review the BIA's administrative findings of fact under the substantial evidence rule, and we are obliged to treat them as conclusive unless the evidence before the BIA was such that any reasonable adjudicator would have been compelled to conclude to the contrary." *Haoua v. Gonzales*, 472 F.3d 227, 231 (4th Cir. 2007) (citing 8 U.S.C. § 1252(b)(4)(B)). Pursuant to the applicable regulations, the BIA reviews factual determinations made by an IJ, including credibility rulings, only "to determine whether [such] findings . . . are clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i). In order to secure judicial relief from the denial of an application for asylum or withholding of removal, an alien "must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 483-84. Finally, we review de novo any legal issues determined by the BIA. *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004).

III.

In this proceeding, Ali seeks our review of the BIA Order to the extent that it affirmed the IJ Order's denial of his requests for asylum and withholding of removal. Under the INA, the Secretary of the DHS and the Attorney General are both authorized to grant asylum to an alien who has satisfied the statutory definition of a refugee. 8 U.S.C. § 1158(b)(1). A "refugee" under the INA is a person who is "unable to or unwilling to return to . . . [his home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).[9] An applicant becomes eligible for asylum upon establishing that he has suffered from past persecution, or that he has a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b). Such an applicant may establish a well-founded fear of future persecution by demonstrating "(1) that a reasonable per-

---

[9]Although neither the INA nor the pertinent regulations define "persecution," we have characterized it as involving "the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition." *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) (citations and internal quotation marks omitted).

son in the circumstances would fear persecution; and (2) that the fear has some basis in the reality of the circumstances and is validated with specific, concrete facts." *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992) (citations and internal quotation marks omitted). In other words, an asylum applicant must demonstrate a subjectively genuine and objectively reasonable fear of future persecution on account of a statutorily protected ground. *Yong Hao Chen v. INS*, 195 F.3d 198, 201-02 (4th Cir. 1999); *see also* 8 C.F.R. § 208.13 (b)(2)(B) (providing that applicant's fear of persecution is well-founded if it is on account of protected ground and there is "reasonable probability of suffering such persecution"). Importantly, an applicant for asylum bears the burden of establishing his eligibility for such relief. 8 C.F.R. § 208.13(a); *Gonahasa v. INS*, 181 F.3d 538, 541 (4th Cir. 1999).

An award of relief in the form of withholding of removal, on the other hand, implicates a more demanding standard of proof than the "well-founded fear" standard applicable to asylum requests, in that a "[w]ithholding of removal is available only to an alien who can demonstrate a clear probability of persecution on account of his race, religion, nationality, membership in a social group, or political opinion." *Ngarurih v. Ashcroft*, 371 F.3d 182, 189 n.7 (4th Cir. 2004) (citations and internal quotation marks omitted). Thus, an applicant for relief who has failed to satisfy the less stringent "well-founded fear" standard of proof required for asylum relief is necessarily also unable to establish an entitlement to withholding of removal. *Id.*[10]

---

[10]In order to secure relief under the CAT, an applicant is obliged to establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The regulation implementing the CAT defines "torture" as

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Ali maintains that the BIA erred in two respects in denying his requests for asylum and withholding of removal. First, he asserts that the BIA erroneously decided that he had not established a well-founded fear of persecution on the basis of his actual or imputed political opinions. Second, Ali contends that the BIA erred in ruling that the DHS's disclosure to Egyptian officials that he was applying for asylum failed to establish an independent ground for relief. We assess these contentions in turn.

A.

1.

In disposing of Ali's Application, the IJ Order credited his testimony regarding the likelihood that he would be tortured upon being returned to Egypt, and the BIA Order recognized that Ali "clearly has a heightened fear of — and risk of — torture in Egypt." BIA Order 3. Despite this conclusion and its award of CAT relief, the BIA agreed with the IJ Order that Ali "has not met his burden of establishing a well-founded fear of persecution on account of a protected ground under the Act, as is required to establish eligibility for asylum." *Id.* at 2. Instead, the BIA Order ruled that Ali faces punishment upon his return to Egypt because of "his failure to continue his 2-year term of military service," which "would constitute prosecution, not persecution." *Id.* The BIA rejected Ali's claim that he would be persecuted on the basis of political opinions imputed to him because he had sought asylum in the United States and married an American woman of Jewish descent, finding instead that Ali's fears "did not stem from suspected political opinion grounds." *Id.* Because Ali failed to satisfy the burden of proof necessary for an asylum award, the BIA concluded that he had also failed to satisfy the more stringent "clear probability standard of eligibility required for withholding of removal." *Id.* Ali contends that the BIA erred in so ruling, and that he is entitled to

---

*Id.* § 208.18(a)(1). The IJ and BIA have already agreed that Ali is entitled to protection under the CAT. Although the CAT issue was unsuccessfully appealed to the BIA, the Attorney General has not pursued it further.

both asylum and withholding of removal on the basis of his "actual or imputed" pro-Israeli political opinions.

2.

As a preliminary matter, there is no evidentiary support for the proposition that Ali possessed any *actual* pro-Israeli political opinions. His wife is not Jewish; he left Egypt to attend a training course for the Egyptian Army, not because of his political beliefs; he has protected sensitive Egyptian military information during the application process; and he has not asserted any political opinions. Accordingly, Ali must, to establish the merit of his Application, show that he is deemed by Egypt to hold "imputed" political opinions that are applicable in this proceeding. *See In re S-P-*, 21 I. & N. Dec. 486, 489 (BIA 1996) ("Persecution for 'imputed' grounds (e.g., where one is erroneously thought to hold particular political opinions or mistakenly believed to be a member of a religious sect) can satisfy the 'refugee' definition."). In this regard, Ali bore the burden of establishing the necessary nexus between his future treatment in Egypt and his imputed political opinions, as well as the burden to "show that his persecutors actually imputed a political opinion to him." *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997). Although Ali may properly be prosecuted in Egypt for desertion and other criminal acts, he contends that he will in fact be persecuted, and thereby suffer from torture, prolonged detention, or even death, on account of his imputed political opinions. We thus assess the more specific aspects of this contention.

a.

First, Ali contends he will be persecuted in Egypt because his wife is not Egyptian and has a "Jewish surname." Petr.'s Br. 13. Because of his wife's name, Ali maintains that the Egyptian government will impute pro-Israeli political opinions to him, and that he will be accused of sharing sensitive information with the Israeli or United States governments. Ali also asserts that, as an Egyptian Army officer, he will face an investigation for marrying a non-Egyptian, because the Egyptian government will believe that he would be influenced to discuss matters of national security with his wife or her family.

There are readily apparent problems with this contention. First, although Ali's wife may be of Jewish descent, she is not Jewish. Indeed, Stine testified that, while she prays to God, she does not consider herself a member of any specific faith, informing the IJ that her mother is Protestant and that she does not know the religion of her deceased father. Furthermore, the record does not contain any evidence that the Egyptian government will actually seek to persecute Ali for his marriage to Stine or for any political opinions imputed to him on the basis thereof. Finally, Ali's expert acknowledged that the Egyptian government would investigate whether Stine is Jewish before making any such assumption or seeking to punish Ali on that basis.

### b.

Second, Ali fears persecution by Egypt because he has applied for asylum in the United States. Specifically, Ali believes that he will be interrogated and punished more severely because he has spoken of his fear of torture at the hands of the Egyptian Army and has applied for asylum in this country. Indeed, Ali contends that "[b]eing accused of treason is a political accusation," both historically and in this case. Petr.'s Br. 24. This is so, Ali maintains, because "[t]reason, of course, involves throwing ones [sic] lot with another country and the accusation that one has betrayed his or her country." *Id.* at 25. Given his "imputed political treason" against Egypt, Ali maintains that he will be persecuted there and is entitled to asylum in the United States. *Id.*

There are obvious problems with this contention. First and foremost, Egypt has not charged Ali with treason, but instead has indicated, in communications about Ali between DHS and the Egyptian Embassy, its desire to prosecute Ali for military desertion, fraud in connection with his Egyptian marriage, and causing Egypt to lose the cost of his military training and travel. On these undisputed facts, we are unable to say that he will be persecuted in Egypt because he has applied for asylum, or disturb the BIA's ruling that Egypt intends to prosecute Ali solely for legitimate reasons.

### c.

Ali also maintains that, although the Egyptian government has accused him of desertion from its Army and other offenses, it has

exhibited an eagerness for his return to Egypt that betrays its actual desire to persecute him for an illegitimate and statutorily protected reason — his actual or imputed political opinions. Indeed, Ali asserts that the fact that the Egyptian government has gone to great lengths to seek his return "underscore[s] the political opinion they have imputed to [him]." Petr.'s Br. 24. We are, however, unable to accept this contention or the notion that the Egyptian interest in Ali's return to his country necessarily indicates a persecutory motive. Ali has conceded that he was a high-ranking Egyptian Army officer, that he possesses an ongoing obligation to the Egyptian military, that he was privy to sensitive Egyptian military information, that he came to the United States on a visa to gain further military training, and that he is now considered an Egyptian Army deserter. In these circumstances, the strong Egyptian interest in Ali's return to his country fails to establish that Egypt has imputed any political opinions to Ali.

d.

Ali has been accorded protection under the CAT by both the IJ and the BIA due to the likelihood that he will be tortured as punishment for his alleged desertion and other offenses. Ali argues that because of this "excessive" punishment, "it is reasonable to believe that such torture would be motivated at least in part due to an imputed political opinion of hostility toward the Egyptian state and treason in favor of Israel." Petr.'s Br. 24. Although the IJ found that it is more likely than not that Ali will be tortured upon his return to Egypt, the IJ observed that "any harm [Ali] would suffer would be on account of a person of his rank and knowledge deserting from the military." IJ Order 18-21. Under the applicable legal principles, this potential harm was deemed legally insufficient by the IJ and the BIA for an award of either asylum or withholding of removal.

Although Ali's present situation may be unfortunate, the IJ and BIA Orders were correct in determining that punishment for desertion or the other identified criminal offenses does not constitute a protected ground for the purpose of asylum eligibility. *See Matter of Maldonado-Cruz*, 19 I. & N. Dec. 509, 516 (BIA 1988) (finding that punishment or threat of punishment for desertion is disciplinary tool; thus, such threat is neither act of persecution, nor evidence of persecution on account of political opinion or any other ground set forth

in Act); *Matter of A-G-*, 19 I. & N. Dec. 502, 507 (BIA 1987) (holding that government has right to require military service and may enforce that requirement with reasonable penalties).[11] This is so because the potential for a criminal prosecution in an applicant's native country does not alone constitute persecution under the INA. *See Matter of Nagy*, 11 I. & N. Dec. 888, 891 (BIA 1966) (concluding that prosecution for violations of law "and consequently, [exposure] to legal penalties which may be comparatively severe by United States standards of justice does not . . . establish the likelihood of 'persecution' within the contemplation of" the INA). Indeed, we have observed that "[t]his important principle respects a government's freedom to devise its own laws and penalties for criminal conduct." *Menghesha v. Gonzales*, 450 F.3d 142, 147 n.2 (4th Cir. 2006). As we have observed, however, "where the motive underlying a purported prosecution is illegitimate, such prosecution is more aptly called persecution." *Id.* As the IJ Order recognized, even treatment that is regarded as "morally reprehensible" does not constitute "persecution" qualifying for protection under the INA unless it occurs on account of one of the protected grounds spelled out therein. IJ Order 15 (quoting *Matter of T-M-B-*, 21 I. & N. Dec. 775, 777 (BIA 1997) (citations and internal quotation marks omitted)). And the IJ Order specifically concluded that Ali had "failed to establish how or why the Egyptian government would impute a political opinion [to] him because of his desertion." *Id.* at 18. The IJ Order also found that "there is no evidence that the [Egyptian] government would impute a political opinion to [Ali] and persecute him for [his marriage to an American with a Jewish last name]." *Id.* Concluding that "any harm [Ali] would face would be on account of someone in his sensitive position deserting the military," the IJ Order determined that Ali had failed to establish a well-founded fear of persecution on account of a protected ground. *Id.*

---

[11]In support of his position here, Ali relies on *M.A. v. INS*, 899 F.2d 304, 312 (4th Cir. 1990) (en banc), maintaining that "although a country has a sovereign right to enforce its military laws, when punishment for violation of such laws is disproportionately severe on account of a protected ground, an individual will be considered eligible for asylum." Petr.'s Reply Br. 7. Because Ali has failed to show that the punishment he might receive in Egypt would be "on account of a protected ground," our decision in *M.A.* is inapplicable in this proceeding.

In its appeal ruling, the BIA agreed that the IJ Order had been "reasonable in concluding that [Ali's] fears did not stem from suspected political opinion grounds." BIA Order 2. These factual determinations are not clearly erroneous, and they compel us to conclude that the BIA Order is supported by substantial evidence. As a result, Ali is unable to establish a well-founded fear of future persecution on account of an INA protected ground (that is, his political opinions), and we are obliged to reject this aspect of his petition for review.[12]

---

[12]In support of his contention that the BIA erroneously determined that he had not established a well-founded fear of persecution, Ali asserts that the IJ and the BIA failed to assess the possibility that Egypt has a mixed motive for his anticipated torture, that is, that it will be "motivated at least in part on account of a protected ground." Petr.'s Br. 17. In support of this proposition, Ali relies primarily on our decision in *Menghesha v. Gonzales*, where we recognized that "[u]nder the INA's 'mixed-motive' standard, an asylum applicant need only show that the alleged persecutor is motivated *in part* to persecute him on account of the protected trait." 450 F.3d 142, 147-48 (4th Cir. 2006). Accordingly, Ali contends that the Egyptian government's lawful motive for punishing him (military desertion) is not conclusive, and that the BIA and IJ were also obliged to assess the evidence that Egypt would impute political opinions to him.

The mixed-motive legal principles that Ali relies upon have been somewhat narrowed by amendments made to the INA in the REAL ID Act of 2005. *See* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., 119 Stat. 231 (May 11, 2005). These amendments, applicable here (but not in *Menghesha*) because they "apply to applications for asylum, withholding, or other relief from removal made on or after [May 11, 2005]," *id.* § 101(h)(2), 119 Stat. 230, 305, added, in pertinent part, a requirement that an applicant establish that a protected ground (here, political opinion) was or will be "at least one central reason" for persecution. 8 U.S.C. § 1158(b)(1)(B)(i).

Thus, in order to demonstrate his eligibility for asylum or withholding of removal, Ali is obliged to establish that his imputed political opinions are "at least one central reason" for his anticipated persecution. Contrary to Ali's contentions, the IJ and BIA considered all possible motives and did not end their review of the evidence after discovering a lawful reason for Ali's anticipated harm. Because we agree with the BIA Order that Ali has failed to show a well-founded fear of persecution based in any degree on his political opinions, Ali remains unable to secure relief by way of asylum or withholding of removal.

## B.

In the second contention of Ali's petition for review, he maintains that he is entitled to relief because a DHS agent revealed the existence of his asylum application to an Egyptian Embassy official. In that regard, it is undisputed that, in August 2005, a DHS agent phoned the Egyptian Embassy and advised her contact there that Ali was seeking asylum. The Attorney General concedes that this disclosure was an improper one, but contends that it does not render Ali eligible for asylum or withholding of removal. The applicable regulation, found at 8 C.F.R. § 208.6(a), provides that "[i]nformation contained in or pertaining to any asylum application . . . shall not be disclosed without the written consent of the applicant."

In support of his contention that he is eligible for relief because of the DHS agent's improper disclosure, Ali urges us to be guided by the Second Circuit's 2006 decision in *Lin v. Department of Justice*, 459 F.3d 255 (2d Cir. 2006). Unfortunately for Ali, the *Lin* case is distinguishable from this proceeding on its facts. In *Lin*, the court determined that our government's release of an unredacted document to Chinese authorities for authentication gave them notice of Lin's asylum application and breached the confidentiality owed to him. 459 F.3d at 262. Although the *Lin* decision recognized that "the violation of a regulation does not necessarily require the vacatur of an order of removal," the court observed that a violation of § 208.6 is "not merely a procedural flaw in an immigration proceeding." *Id.* at 267-68. Instead, the court concluded that the United States "through its negligence has potentially exposed Lin and his family to risks beyond those that he claims caused him to flee China." *Id.* at 268. Because this "new risk of persecution" was "independent of his original claim," Lin's application was remanded to the BIA for consideration of whether Lin had established a well-founded fear of persecution. *Id.*

As the Attorney General points out here, however, any risk of persecution Ali might face in Egypt from the filing of his Application was not a "new risk of persecution" that was "independent of his original claim." *Id.* Unlike in *Lin*, Ali's fears in this regard were specifically outlined in his Application and thus considered by the BIA. Accordingly, the BIA assessed and rejected Ali's assertion that his Application gave rise to a claim of persecution on account of a pro-

tected ground. The BIA concluded that, although Ali may face pun-ishment upon returning to Egypt, his treatment there will be due to his military desertion and other alleged criminal activity and not on account of a protected ground. In these circumstances, we also reject Ali's petition for review on this basis.[13]

IV.

Pursuant to the foregoing, we deny Ali's petition for review of the denial of his requests for asylum and withholding of removal.

*PETITION FOR REVIEW DENIED*

---

[13]Of note, the Egyptian government was interested in Ali's return to Egypt well before the DHS agent improperly disclosed the existence of his asylum request. It tracked Ali closely while he was here, and it was seeking his return to Egypt prior to both his Application (in June 2005) and the DHS agent's improper disclosure to the Egyptian Embassy (in August 2005). In these circumstances, the Egyptian government would have likely discovered Ali's Application in any event.