**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 08-2249**

---

ASMAA JAMAL ASHQAR,

    Petitioner,

  v.

ERIC H. HOLDER, JR., Attorney General,

    Respondent.

---

On Petition for Review of an Order of the Board of Immigration
Appeals.

---

Argued: September 22, 2009    Decided: December 8, 2009

---

Before NIEMEYER and DUNCAN, Circuit Judges, and James P. JONES,
Chief United States District Judge for the Western District of
Virginia, sitting by designation.

---

Petition for review denied by unpublished per curiam opinion.

---

**ARGUED:** Eleanor Roy Barrett, DUANE MORRIS, LLP, Philadelphia,
Pennsylvania, for Petitioner.  Shahrzad Baghai, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON
BRIEF:** Denyse Sabagh, Thomas K. Ragland, DUANE MORRIS, LLP,
Washington, D.C., for Petitioner.  Tony West, Assistant Attorney
General, Civil Division, Terri J. Scadron, Assistant Director,
UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration
Litigation, Washington, D.C., for Respondent.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Asmaa Jamal Ashqar ("Mrs. Ashqar") petitions for review of an order of the Board of Immigration Appeals (the "BIA"), entered October 3, 2008, denying her application for asylum and withholding of removal. According to Mrs. Ashqar, the BIA erroneously concluded that she had failed to demonstrate she had a well-founded fear of future persecution. As explained below, we reject this contention and deny the petition for review.

I.

Mrs. Ashqar is a Kuwaiti-born Palestinian who was first admitted to the United States in March 1990 on a J-2 visa. She moved to Oxford, Mississippi, in order to join her Palestinian husband, Dr. Abdelhaleem Ashqar ("Dr. Ashqar"), who entered the United States on a J-1 visa in November 1989 after receiving a fellowship to study at the University of Mississippi. Once Dr. Ashqar's studies were completed, the Ashqars moved to Virginia.

In 1998, Dr. Ashqar filed an application for asylum in the United States, in which Mrs. Ashqar was a derivative applicant. Shortly thereafter, the Immigration and Naturalization Service

2

(the "INS")[1] charged Mrs. Ashqar with removability because she was in the United States longer than her authorized stay.

Dr. Ashqar eventually decided to withdraw his application for asylum in 2003, prompting Mrs. Ashqar to move to sever her asylum claim from her husband's. On June 16, 2003, the Immigration Court in Arlington, Virginia, granted Mrs. Ashqar's motion.

In her independent application, Mrs. Ashqar conceded she had overstayed her visa but sought relief from removal. Mrs. Ashqar requested asylum pursuant to 8 U.S.C.A. § 1158 (West 2005) due to her fear of persecution in Israel and the Occupied Territories. She also sought withholding of removal under both the Immigration and Nationality Act (the "INA") and the Convention Against Torture (the "CAT").

A.

On March 15, 2004, the Immigration Court held a hearing on Mrs. Ashqar's application. The following is a summary of the facts taken from the record of that hearing.

Mrs. Ashqar grew up as a refugee in Gaza in the Israeli Occupied Territories. It was there, beginning in 1982, she

---

[1] On March 1, 2003, the INS integrated into the newly formed Department of Homeland Security (the "DHS"). Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2195-205 (2002). Thus, the DHS is now the agency overseeing Mrs. Ashqar's immigration case.

3

attended the Islamic University of Gaza. Sometime between September 1986 and January 1987, Mrs. Ashqar married Dr. Ashqar, a lecturer at the university.[2] A few months after the Ashqars married, Dr. Ashqar was promoted to the position of university director of public relations and became editor of the university's magazine.

Dr. Ashqar was an outspoken opponent of the Israeli occupation. According to Mrs. Ashqar, Dr. Ashqar's political activities were not ignored by the Israeli government. In 1981, as a student at Birzeit University, Dr. Ashqar was arrested, beaten, tortured, and held in jail for sixteen days by the Israeli military for having participated in a demonstration protesting the creation of the state of Israel.

In contrast, Mrs. Ashqar admits that she was never mistreated by Israeli authorities. She was, however, questioned by Israeli intelligence twice between 1984 and 1986 as a member of the Islamic University of Gaza's student council. After she

---

[2] There is some discrepancy in the record as to when the Ashqars were married. The Immigration Court's decision first states that the Ashqars were married on September 19, 1986, then later notes that Mrs. Ashqar testified she was married in January 1987. According to the transcript of the hearing, Mrs. Ashqar testified that the Ashqars were engaged in September 1986, signed a marriage contract in December 1986, and held the wedding in January 1987. Fortunately, to consider the merits of this petition, we do not need to determine the correct date.

4

was married, she was never again summoned for questioning by Israeli officials.

It was a different story for her husband. The Israeli authorities interrogated Dr. Ashqar on several occasions. Between 1986 and 1989, he was often detained and questioned as well as threatened with jail and/or deportation. When Dr. Ashqar attempted to leave the Occupied Territories for the United States in 1989 to pursue his studies at the University of Mississippi, the Israeli officials tried to stop him. Eventually, the authorities permitted Dr. Ashqar to leave, but only after a former Israeli Interior Minister intervened on his behalf. Mrs. Ashqar, on the other hand, testified that she had been able to follow her husband a few months later, in 1990, without any complications.

After settling in the United States, Dr. Ashqar continued to attract attention from Israeli authorities and began also garnering the U.S. government's attention. As early as December 1991, the FBI interviewed Dr. Ashqar about his activities for the Islamic University of Gaza and his purported fundraising for the Islamic Resistance Movement, an organization commonly

5

referred to as HAMAS.[3]  Much of its information on Dr. Ashqar's ties to HAMAS at that time came from Israeli officials.

In 1993, Mrs. Ashqar returned to Gaza for the first and only time to visit with family for two months.  She did not experience any difficulties with the Israeli authorities while she was there.

Following Mrs. Ashqar's return, in 1994, a book was published in Israel mentioning Dr. Ashqar's connection to HAMAS. Mrs. Ashqar testified that an FBI agent had approached her husband and requested a meeting with him to question him about the book.  According to the Ashqars, the FBI questioned Dr. Ashqar at the request of the Israeli government.

In 1997, Dr. Ashqar completed his Ph.D. program at the University of Mississippi, and the Ashqars moved to Virginia where Dr. Ashqar planned to work.  In February 1998, Dr. Ashqar was subpoenaed to testify before a grand jury in the Southern District of New York about persons accused of fundraising for HAMAS.  Dr. Ashqar gained international media attention when he refused to testify, telling reporters he feared his answers

---

[3] HAMAS is an acronym for Islamic Resistance Movement in Arabic, Harakat al-Muqawamah al-Islamiyya. <u>United States v. Holy Land Found. for Relief & Dev.</u>, 493 F.3d 469, 471 n.1 (5th Cir. 2007).  On October 8, 1997, the U.S. Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to 8 U.S.C.A. § 1189 (West 2005).  (J.A. 1013.)

would be used against others close to him in the Palestinian liberation movement. The district court found him in civil contempt, and he was detained for six months, during which he went on a hunger strike and was eventually force fed by court order.

Dr. Ashqar was subpoenaed a second time in 2003 to appear before a grand jury in the Northern District of Illinois, but again he refused to testify, was held in contempt and jailed, and began a hunger strike. Dr. Ashqar was subsequently indicted by a federal grand jury for criminal contempt, obstruction of justice, and conspiring to violate the RICO act to finance the affairs of HAMAS.[4]

Mrs. Ashqar bases her claim for asylum on these more recent events. She believes that the publicity surrounding the book in 1994 and the subsequent media coverage of her husband's refusal to testify before the grand juries made her husband a much bigger target of Israeli officials. Consequently, she fears that if she were to return to her homeland, the Israeli authorities would detain and torture her in order to force Dr.

---

[4] Dr. Ashqar was eventually convicted of criminal contempt and obstruction of justice, but not the RICO charge, and was sentenced to 135 months in prison. See United States v. Ashqar, 582 F.3d 819, 821 (7th Cir. 2009). The Seventh Circuit recently affirmed his convictions and sentence. Id.

7

Ashqar to eventually return to the Occupied Territories where they would be able to arrest him.

B.

On April 25, 2006, the Immigration Judge (the "IJ") granted Mrs. Ashqar's application for asylum without considering either of her requests for withholding removal. The IJ found that Mrs. Ashqar had established that she had a reasonable fear of future persecution if she returned to Israel or the Occupied Territories based on the political opinions imputed to her from her association with her husband.

The DHS filed a timely appeal of the IJ's decision to the BIA. On October 3, 2008, the BIA sustained the appeal and reversed the IJ's decision. The BIA concluded "that there is no specific evidence in the record which, taken alone or cumulatively, would support a finding that [Mrs. Ashqar] has a well-founded fear of persecution in Israel." (J.A. 18.) The BIA also denied Mrs. Ashqar's requests for withholding of removal under the INA and CAT.

On October 29, 2008, Mrs. Ashqar filed a petition for review with this court pursuant to 8 U.S.C.A. § 1252 (West 2005). In her petition, Mrs. Ashqar only challenges the BIA's ruling on her asylum eligibility.

8

The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who is unable or unwilling to return to her home county because she has "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ."  8 U.S.C.A. §§ 1101 (a)(42)(A), 1158(b)(1)(A) (West 2005).  The burden is on the applicant to demonstrate that she has a well-founded fear of persecution based on one or more of the listed grounds.  See Abdel-Rahman v. Gonzales, 493 F.3d 444, 449 (4th Cir. 2007).  Such a fear is proven by showing there is a reasonable possibility that the applicant will be persecuted. 8 C.F.R. § 1208.13(b)(2)(i)(B) (2009).

Mrs. Ashqar claims that if she returns to the Occupied Territories she has a well-founded fear that she will be targeted for persecution because of: (1) the political opinions of her husband imputed to her; and (2) her membership in the social group of wives of political dissidents.  She believes that, because of his political activism, the Israeli authorities want to capture Dr. Ashqar.  Thus, it is Mrs. Ashqar's contention that if she returns to her homeland, the Israeli government will persecute her in order to lure Dr. Ashqar back to the Occupied Territories.  The BIA found, however, that Mrs.

Ashqar presented no persuasive evidence to demonstrate that she had a well-founded fear of such an occurrence.

Mrs. Ashqar argues that the BIA erred in denying her asylum application because: (1) the BIA applied the incorrect legal standard; and (2) the BIA's decision is not supported by substantial evidence. We disagree.

A.

It is Mrs. Ashqar's contention that the BIA mistakenly required her to show more than a reasonable possibility of future persecution to establish a well-founded fear. We review this question of law de novo. See Abdel-Rahman, 493 F.3d at 449. Although the BIA did not cite to 8 C.F.R. § 1208.13(b)(2)(i)(B) -- the regulation outlining the reasonable possibility standard -- a plain reading of the BIA's analysis convinces us that it was nonetheless applying the correct criterion.[5]

---

[5] The BIA did incorrectly cite to 8 C.F.R. § 1208.16(b)(1) to support the statement that "the burden of proof to establish a well-founded fear of future persecution remains with [Mrs. Ashqar]." (J.A. 16.) That section actually sets out the burden of proof necessary to establish a past threat to life or freedom claim for withholding of removal under the INA and CAT and does not relate to asylum claims. See 8 C.F.R. § 1208.16(b)(1) (2009). Regardless of the citation, the BIA was nonetheless correctly stating the law -- the burden of proof to demonstrate a well-founded fear of future persecution lies with the applicant. See 8 C.F.R. § 1208.13(a) (2009).

10

The first indication that the BIA applied the proper standard is that the BIA stated in its opinion that "[a]lthough there is anecdotal evidence in the record that the wives and family members of suspected terrorists have sometimes been subjected to mistreatment of various kinds by the Israeli government, there is no persuasive evidence that such an occurrence is a reasonable possibility in [Mrs. Ashqar's] case." (J.A. 17 (emphasis added).)  We do not believe, as Mrs. Ashqar argues, that the BIA's use of the phrase "reasonable possibility" was a mere coincidence.

The BIA stated several times in its opinion such phrases as: there is "no persuasive evidence" that shows persecution "would" occur; and it was mere "speculation" that Mrs. Ashqar "might," "would," or "will" face persecution.  (See J.A. 17-18.)  While Mrs. Ashqar argues that the use of "would," "might," and "will" proves that the BIA applied a "more likely than not" standard, we find that argument unconvincing.  Mrs. Ashqar's reading ignores the fact that the BIA found no convincing evidence of her claim.  To rule that there is a chance of persecution at least some scintilla of persuasive evidence, something more than speculation, is necessary.  Thus, despite its failure to identify the appropriate regulation, the BIA did apply the requisite standard.

11

B.

Given that the BIA applied the correct legal standard, Mrs. Ashqar next contends that the BIA erred by ruling she did not demonstrate a reasonable possibility of persecution.

Judicial review of the BIA's factual determinations is narrow. We review factual findings under the substantial evidence standard. See Abdel-Rahman, 493 F.3d at 448. Such findings are only to be overruled if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C.A. § 1252(b)(4)(B) (West 2005). In other words, "[i]n order to secure judicial relief from the denial of an application for asylum or withholding of removal, an alien 'must show that the evidence [s]he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.'" Abdel-Rahman, 493 F.3d at 448-49 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 483-84). We find that Mrs. Ashqar has failed to overcome this burden.

Mrs. Ashqar first asserts that the BIA completely ignored her claim that she would be persecuted because her husband's political opinions would be imputed to her,[6] but this is easily refuted.

_____

[6] "An imputed political opinion, whether correctly or incorrectly attributed, may constitute a ground for a well-founded fear of political persecution within the meaning of the
(Continued)

12

It is apparent that the BIA did consider the risk of persecution based on imputed political opinions because the BIA spent much of its opinion detailing its disagreement with the IJ's decision. (See J.A. 16-17 ("We disagree with the Immigration Judge's conclusion . . . ."; "the Immigration Judge's decision is incorrect . . . .").) And the IJ ruled solely on Mrs. Ashqar's claim that her husband's political opinions would be imputed to her. Indeed, he did not even consider her other grounds for relief. (See J.A. 117.)

The BIA is not required to specifically delineate between its consideration of Mrs. Ashqar's imputed political opinions and social group grounds for persecution because "[i]ndividual targeting and systematic persecution do not necessarily constitute distinct theories. Rather, an applicant will typically demonstrate some combination of the two to establish a well-founded fear of persecution." Chen v. INS, 195 F.3d 198, 203-04 (4th Cir. 1999).

The BIA's ruling, in fact, was largley based on its finding that Mrs. Ashqar had not sufficiently demonstrated that her risk

INA." Najjar v. Ashcroft, 257 F.3d 1262, 1289 (11th Cir. 2001) (citations, alterations, and internal quotes omitted); see also In re S-P-, 21 I. & N. Dec. 486, 489 (BIA 1996).

13

of persecution had increased from when she previously lived in the Occupied Territories -- a period when Mrs. Ashqar admits she was not persecuted.   Mrs. Ashqar's own testimony confirms that Dr. Ashqar was a highly visible political opponent of the Israeli occupation from 1986 to 1990.  According to Mrs. Ashqar, during that period the Israeli authorities were frequently detaining and interrogating her husband, but they never once came after her.

Furthermore, FBI reports show that Israel had connected her husband to HAMAS as early as January 1991.  Yet, Mrs. Ashqar concedes when she visited Gaza in 1993, she was not disturbed by Israeli officials.

Mrs. Ashqar tried to show that events after 1994 -- the publication of the book connecting Dr. Ashqar to HAMAS and the infamous grand jury incidents -- altered the landscape.  As proof of her increased risk of persecution, Mrs. Ashqar offered evidence that she claimed showed the Israeli government went after her innocent family members.  Viewing the administrative record as a whole however, we conclude substantial evidence supports the BIA's conclusion that Dr. Ashqar's "additional alleged activities in support of Hamas in the United States, and other intervening events, do not show that the Israeli government, which did not persecute [Mrs. Ashqar] in the past, is now inclined to do so."  (J.A. 18.); cf. Chen, 195 F.3d at

14

200-01, 203-05 (ruling that a couple who showed no proof of past persecution when they previously violated China's "one child" policy did not sufficiently demonstrate they faced a reasonable possibility of persecution if they returned with another child, their second violation of the policy.)

Mrs. Ashqar testified that her nephew was detained and tortured by Israeli authorities in 1999 and "the only thing they asked him about was his uncle, [Dr. Ashqar], and his connections to Hamas." (J.A. 103 (emphasis added); see also J.A. 184.) The BIA found that this testimony was contradicted by the nephew's affidavit however. The nephew's affidavit shows that the Israeli authorities believed the nephew himself was a member of HAMAS:

> [The Israeli interrogators] accused me of being a member of Hamas. I was told by the interrogators that people confessed against me during their interrogation. My response was let them face me. I told them that I am not a member of Hamas and never have been a member of Hamas. Also, the interrogator accused me of being detained by the Jordanians, Americans and the Palestinians. I told them that was not true and I was never detained by any one [of] the above governments or anyone. Finally, they accused me of talking to my uncle, Abdelhaleem, on a regular basis and therefore, I must be involved with him for Hamas. I denied all charges.

(J.A. 547.) It is thus not compelling evidence that Mrs. Ashqar, who is not herself tied to HAMAS, would be targeted.

Mrs. Ashqar also offered evidence that the Israeli Army searched the Ashqars' home in the Occupied Territories twice in

15

1995 because they believed Dr. Ashqar had returned from the United States and had a warrant for his arrest. But the BIA ruled that "it is mere speculation to infer from this that the military would have persecuted [Mrs. Ashqar] had she been present or that they will do so now or in the future." (J.A. 17.) We have to agree. The fact that the Israeli Army entered the home pursuant to a warrant for Dr. Ashqar's arrest is not evidence of persecution of Dr. Ashqar, much less his wife. See Abdel-Rahmen, 493 F.3d at 452 ("the potential for a criminal prosecution in an applicant's native country does not alone constitute persecution").

Additionally, the BIA held that Mrs. Ashqar "failed to show a documented pattern of the Israeli government persecuting the innocent wives of alleged or actual Hamas members who have not been directly implicated in terrorist attacks . . . ." (J.A. 17.) Mrs. Ashqar asserts that the BIA erred by considering her the wife of a suspected member of HAMAS, rather than a political dissident. It is unclear why Mrs. Ashqar believes she would be more likely to be persecuted as a wife of a political dissident than as a wife of a suspected HAMAS member, particularly when much of her own argument for asylum rests on the assumption that she faces more danger now that Dr. Ashqar has been publicly tied to HAMAS through the publication of the 1994 book and the incidents with the grand juries. Nonetheless, assuming arguendo

16

that it would be in her favor to be considered a family member of a political dissident rather than suspected member of a terrorist group, we find that substantial evidence supports the BIA's determination.

The record is replete with evidence that Dr. Ashqar was a suspected member of HAMAS, including a 2001 FBI report in which Dr. Ashqar was deemed "a member of the HAMAS U.S. leadership." (J.A. 1015.) Although Mrs. Ashqar argues that the allegations against her husband were false, the record shows that she was not in the best position to make that assessment. Besides her obvious bias by the nature of their relationship, Mrs. Ashqar remained ignorant of their finances and her husband's business pursuits. As the BIA noted, Mrs. Ashqar testified that "she did not involve herself in his 'business' activities, was unaware of what he did while traveling, and did not learn until years later" about a $100,000 check her husband wrote "to a man later designated as a terrorist." (J.A. 18.) Therefore, it is reasonable to conclude that Mrs. Ashqar's testimony was insufficient to overcome other evidence that Dr. Ashqar was involved with HAMAS.

There is substantial evidence as well, to support the BIA's determination that Mrs. Ashqar failed to demonstrate a pattern of Israeli authorities targeting the families of security suspects. Mrs. Ashqar argues that this ignores articles she

17

submitted from human rights organizations about female relatives of security suspects who have been detained without charge in order to indirectly punish the accused.

However, also in the record are the 2003, 2004, and 2005 State Department country reports on Israel and the Occupied Territories. Significantly, the State Department reports do not recognize any retribution directed toward the family members of political dissidents or HAMAS members not accused of terrorist attacks. The State Department mentioned only that the HAMAS members or political opponents themselves have been subject to persecution. While the State Department made the finding that Israeli forces demolish "the homes of the families and relatives of those convicted of or suspected of committing terror attacks, effectively punishing innocent Palestinians not implicated in the attacks," as the BIA noted, there was no evidence in the record that Dr. Ashqar was ever suspected of such an attack. (J.A. 948; see also J.A. 844, 881.)

The BIA relied on the State Department's reports because it apparently found the private organizations' information to be merely "anecdotal" and thus unpersuasive. We cannot fault the BIA for preferring the State Department's assessment.

> A State Department report on country conditions is highly probative evidence in a well-founded fear case. Reliance upon these reports makes sense because this inquiry is directly within the expertise of the Department of State.

18

. . . .

> . . . Absent powerful contradictory evidence, the existence of a State Department report supporting the BIA's judgment will generally suffice to uphold the Board's decision. Any other rule would invite courts to overturn the foreign affairs assessments of the executive branch.

Gonahasa v. INS, 181 F.3d 538, 542-43 (4th Cir. 1999) (citations and internal quotes omitted).

Although we have considerable sympathy for Mrs. Ashqar, "our task is not to reweigh the evidence and determine which of the competing views is more compelling. It is instead to ensure that substantial evidence supports the BIA's judgment." Id. at 542. Accordingly, because we do not find that the evidence compels only one reasonable conclusion in this case, we must defer to the BIA's decision.


III.

Pursuant to the foregoing, we deny Mrs. Ashqar's petition for review of the BIA's denial of her request for asylum.


PETITION FOR REVIEW DENIED